406

HON. DAVID NORIEGA RODRÍGUEZ, demandante y recurrido, *v.* HON. RAFAEL HERNÁNDEZ COLÓN y PEDRO FRANQUI ACOSTA, ADMINISTRADOR DE LA ADMINISTRACIÓN DE SERVICIOS MUNICIPALES, demandados y recurrentes; HON. ANDRÉS ROLÓN MARRERO ET ALS., demandantes y apelantes, *v.* HON. RAFAEL HERNÁNDEZ COLÓN ET ALS., demandados y apelados.

*Números:* AC-89-839
RE-89-687

*Resueltos:* 18 de marzo de 1994

410

412

*Jorge E. Pérez Díaz, Procurador General,* y *Carlos Lugo Fiol, Procurador General Auxiliar,* abogados de el Administrador de Servicios Municipales, recurrente; *Juan Santiago Nieves* y *José Juan Nazario de la Rosa,* de *Nazario & Santiago, Víctor García San Inocencio* y *Luis Rivera Lacourt,* abogados del Hon. David Noriega Rodríguez, recurrido; *Benjamín Rivalta López,* abogado del Hon. Andrés Rolón Marrero, apelante y recurrido.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

Los recursos consolidados de epígrafe versan sobre la *declaración de inconstitucionalidad* que hiciera el Tribunal Superior de Puerto Rico, Sala de San Juan, respecto a las Resoluciones Conjuntas Núm. 94 de la Cámara y Núm. 111 del Senado de 17 de agosto de 1989, *conocidas como "barril de tocino",* así como de aquellas otras similares aprobadas en años anteriores, y sobre los "remedios accesorios" concedidos en dicha sentencia por la Sala de San Juan del Tribunal Superior de Puerto Rico.

I

Entre los días 27 y 28 de junio de 1989, la Cámara de Representantes y el Senado de Puerto Rico aprobaron la Resolución Conjunta de la Cámara Núm. 891 y la Resolución Conjunta del Senado Núm. 356, Resoluciones que concedían una cantidad global de dinero a la Administración de Servicios Municipales (A.S.M.) para que dicha entidad le asignara una suma determinada a cada legislador por distrito.(¹) Las Secs. 4 y 5 de estas Resoluciones, respectivamente, disponían que la A.S.M. desembolsaría las cantidades asignadas a los legisladores de la siguiente forma:

"[El Representante de Distrito] [El Senador de Distrito] someterá al Administrador de Servicios Municipales una relación de las obras y mejoras permanentes que interese que lleven a cabo en su [Distrito Representativo] [Distrito Senatorial] e igualmente las que interese se lleven a cabo para otras obras, adquisición de equipo, compra de materiales y otras actividades de interés social con cargo a los [treinta y ocho mil quinientos ($38,500.00) dólares] [setenta mil ($70,000.00) dólares]."

"Se autoriza a la Administración de Servicios Municipales a transferir a los municipios y las Agencias de Gobierno los fon-

---

(¹) La Resolución Conjunta de la Cámara Núm. 891 asignaba a la A.S.M. la cantidad de nueve millones de dólares ($9,000,000) para obras y mejoras permanentes y la cantidad de un millón quinientos cuarenta mil dólares ($1,540,000) para obras no permanentes, adquisición de equipo, compra de materiales y otras actividades de interés social. De ese dinero, el Administrador de la Administración de Servicios Municipales (en adelante A.S.M.) venía obligado a separar para cada Representante de Distrito doscientos veinticinco mil dólares ($225,000) para ser distribuido por éste en obras y mejoras permanentes en su Distrito y separaría, además, para cada Representante de Distrito treintiocho mil quinientos dólares ($38,500) para ser distribuidos por éste en obras no permanentes, adquisición de equipo, compra de materiales y otras actividades de interés social.

La Resolución Conjunta del Senado Núm. 356, por su parte, asignaba a la A.S.M. la cantidad de seis millones de dólares ($6,000,000) para obras y mejoras permanentes y la cantidad de un millón ciento veinte mil dólares ($1,120,000) para obras no permanentes, adquisición de equipo, compra de materiales y otras actividades de interés social. De ese dinero, el Administrador de la A.S.M. venía obligado a separar para cada Senador de Distrito trescientos setenticinco mil dólares ($375,000) para ser distribuidos por éste en obras y mejoras permanentes en su Distrito y separaría, además, para cada Senador de Distrito setenta mil dólares ($70,000) para ser distribuidos por éste en obras no permanentes, adquisición de equipo, compra de materiales y otras actividades de interés social.

dos arriba indicados según lo disponga el Representante [el Senador] de Distrito."

Ambas Resoluciones fueron enviadas al entonces Gobernador, Lcdo. Rafael Hernández Colón, para su aprobación. Un día antes de que éste las firmara, el entonces Secretario de Justicia (en adelante Secretario), Lcdo. Héctor Rivera Cruz, le remitió una "Opinión"[2] al Gobernador en la que expresó que el esquema de distribución de fondos dispuesto en las referidas resoluciones conjuntas era inconstitucional porque violaba el principio de separación de poderes. A esos efectos, indicó que dicho esquema no tan solo constituía una abrogación de la Rama Legislativa de los poderes de la Rama Ejecutiva, sino que, además, tenía el efecto de encomendar a un miembro de la Rama Legislativa la ejecución de una ley, ello en contravención de las Secs. 1 y 4 del Art. III de nuestra Constitución, L.P.R.A., Tomo 1. Expresó, de otra parte, el mencionado Secretario que tal práctica atentaba contra la adecuada fiscalización y el control del destino de los fondos públicos y, a su vez, propiciaba el desvío de tales fondos para fines no públicos y sí privados del propio legislador, incumpliendo así con la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1.

Le recomendó el Secretario al Gobernador que no convirtiera en ley las referidas Resoluciones o que, en la alternativa, ordenara al Administrador de la A.S.M. a paralizar todo desembolso de fondos relacionado con estas Resoluciones hasta tanto la Asamblea Legislativa las enmendara para suprimir la intervención del legislador en la forma allí contemplada o detallar con precisión el uso que se le daría a los fondos asignados. Indicó el Secretario, por último, que de mantenerse una asignación global al Administrador de la A.S.M., sin detallar el destino específico de los

---

[2] LX Opiniones del Secretario de Justicia 25 (1989).

fondos, correspondería a este funcionario la decisión sobre su utilización.

El Gobernador Hernández Colón optó por la segunda alternativa. El 17 de agosto de 1989 firmó las aludidas Resoluciones, adviniendo las mismas, la Resolución Conjunta Núm. 94 de la Cámara y la Núm. 111 del Senado, respectivamente, 1989 Leyes de Puerto Rico 571–573 y 590–591.([3]) No obstante ello, el Gobernador le ordenó al Administrador de la A.S.M., Pedro Franqui Acosta, no ejecutar dichas Resoluciones, paralizando mediante tal proceder el desembolso de los fondos objeto de las mismas así como el desembolso de aquellos fondos remanentes de otras resoluciones conjuntas de "barril de tocino" que se remontaban al 1981.([4])

El 5 de septiembre de 1989 varios Representantes de la Cámara requirieron del Gobernador Hernández Colón que pusiera en vigor la Resolución Conjunta Núm. 94. Ante la negativa del Primer Ejecutivo a actuar, según le fuera solicitado, éstos radicaron una petición de *mandamus* ante este Tribunal. Alegaron que la controversia planteada en dicha acción iba *"dirigida a vindicar la función de la Asamblea Legislativa en cuanto al procedimiento para la aprobación de las leyes y resoluciones conjuntas"*. Alegaron, además, que la negativa del Gobernador a poner en vigor la Resolución Conjunta Núm. 94 violaba la Sec. 4 del Art. IV de nuestra Constitución, L.P.R.A., Tomo 1, la cual le

---

([3]) Sabido es que el trámite que sigue toda resolución conjunta es idéntico al de un proyecto de ley, Sec. 18 del Art. III de la Constitución, L.P.R.A., Tomo 1; ambos tienen fuerza de ley y obligan tanto a la ciudadanía como al Estado en su cumplimiento. La única diferencia entre éstos estriba en que la resolución conjunta es de carácter transitorio y pierde su fuerza al realizarse la obra o cumplirse la finalidad que persigue. N. Rigual, *El poder legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R., 1961, págs. 95–96; Sec. 1 de la Ley Núm. 2 de 4 de marzo de 1953 (2 L.P.R.A. sec. 200).

([4]) Conforme a lo que le expresara el Secretario de Justicia en la Opinión emitida "[h]asta el 1981 las Resoluciones Conjuntas de esta naturaleza especificaban detalladamente *las obras que se realizarían en cada municipio* con cargo a los fondos consignados; se describía la obra a realizarse; se asignaban los fondos al municipio o a la agencia estatal que sería responsable de la construcción y se fijaba la cantidad asignada para su realización".

imponía al Gobernador el deber de cumplir y hacer cumplir las leyes, por lo que éste carecía de facultad para ordenar la paralización del desembolso de fondos. Adujeron que el Primer Ejecutivo, al "declarar inconstitucional" la aludida resolución sin que hubiera interpretación judicial alguna a esos efectos, se había conferido una facultad que le correspondía a la Rama Judicial. Adujeron que ambas actuaciones vulneraban los principios de separación de poderes.(⁵) Esbozaron que de no emitirse el auto solicitado sufrirían daños irreparables "al no poder continuar con la obra de gobierno que le encomendó el Pueblo de Puerto Rico".

Posteriormente, el Representante por Acumulación del Partido Independentista Puertorriqueño (en adelante P.I.P.), Hon. David Noriega Rodríguez, presentó ante el Tribunal Superior de Puerto Rico, Sala de San Juan, una solicitud de sentencia declaratoria, *injunction* provisional, preliminar y permanente, en la que impugnó la validez constitucional de las aludidas resoluciones conjuntas *por las mismas razones expuestas en la Opinión del Secretario.* Alegó la existencia de balances remanentes en las asignaciones del "barril de tocino", que se remontaban al año 1981, que debieron haber revertido al Fondo General del Tesoro Estatal (en adelante Fondo General) dentro de los seis (6) meses siguientes al cierre del año económico al que pertenecían. Arguyó que el esquema de asignación y distribución de fondos públicos de las Resoluciones Conjuntas Núms. 94 y 111 obstaculizaba el cumplimiento de la Sec. 9 del Art. VI de nuestra Constitución, ante, en lo referente a la fiscalización, el manejo y el destino de tales fondos. Solicitó del tribunal que: declarara inconstitucional las Resoluciones Conjuntas Núms. 94 y 111 así como aquellas que

---

(⁵) A esos efectos señalaron que el Primer Ejecutivo ejerció válidamente su discreción al aprobar un proyecto mediante su firma, por lo que éste carecía de facultad para ordenar la paralización de la ejecución de una ley. Expresaron que si el Gobernador entendía que la resolución adolecía de legalidad, éste debió haber vetado tal resolución, mas no podía convertir en ley la resolución y proceder a ordenar su paralización; adujeron que éste tenía el deber ministerial de ejecutar la ley.

tenían balances remanentes,(6) prohibiera a los codeman-
dados —el Gobernador y Franqui Acosta— utilizar tales
fondos y les ordenara restituir los mismos al Fondo Gene-
ral para usar y disponer de ellos conforme el ordenamiento
constitucional; ordenara al Administrador de la A.S.M. de-
volver al Fondo General los balances remanentes no utili-
zados de las resoluciones de "barril de tocino" de años pre-
vios, y dictara un remedio declaratorio disponiendo las
condiciones y salvaguardas constitucionales que debía con-
tener toda resolución conjunta que asignara fondos públi-
cos para la realización de obras permanentes y no perma-
nentes en cuanto a los criterios de especificidad y controles,
de modo que permitieran una fiscalización efectiva por
cualquier miembro de la Asamblea Legislativa.

Este Tribunal ordenó el traslado de la acción de *manda-
mus* al Tribunal Superior, Sala de San Juan. El tribunal a
quo celebró vista en la que los codemandados, en relación a

---

(6) En su petición, aparte de las razones expuestas en la Opinión del Secretario
de Justicia, Noriega Rodríguez impugnó el barril de. tocino porque creaba una clasi-
ficación discriminatoria entre los legisladores de distrito y los electos por acumula-
ción, favorecía a ciertos legisladores por acumulación sobre otros, le confería al le-
gislador que disfrutaba del barril de tocino ventajas incompatibles con el proceso
democrático y estaba diseñado para excluir a los legisladores del Partido Indepen-
dentista Puertorriqueño (en adelante P.I.P.) de participar de los mismos por ser le-
gisladores por acumulación. Alegación Núm. 18. Atacó la constitucionalidad de todas
las resoluciones todavía vigentes que crearon barriles de tocino "por el doble efecto
constitucional de arrebatar impermisiblemente funciones del poder ejecutivo y por
incurrir en sub-inclusividad que promueve el discrimen contra cierto tipo de
legislador". Aclaró, sin embargo, que:
 "... el planteamiento relacionado a la subinclusividad no está dirigido a obtener
como remedio un trato igual, sino a la erradicación del mal de fondo, detrimental a
una política pública de establecer prioridades en la asignación de fondos públicos
siguiendo un criterio científico y con la participación integrada de los poderes ejecu-
tivo y legislativo. El demandante persigue erradicar la práctica irracional de estos
barriles de tocino." Alegación Núm. 19.
 Además, alegó que éste tenía "entre otros deberes que le impone su cargo, fis-
calizar la marcha del gobierno, ... informar al pueblo y proteger la forma republicana
de gobierno". Esbozó que "en descargo de tales deberes y obligaciones de su cargo, así
como en su gestión legislativa, éste estaba sufriendo y sufriría daño irreparable de
no mediar un mandato expreso del tribunal prohibiendo el desembolso de cuales-
quiera fondos asignados por aquellas resoluciones ... que no hayan sido utilizados."
Alegación Núm. 22. Por último, expresó no tener otro remedio en ley para "detener el
daño irreparable que le causaban los actos y omisiones de los codemandados" y "para
evitar que sus derechos constitucionales como legislador sigan siendo violentados al
negársele la igual protección de las leyes". Alegación Núm. 23.

la acción de *mandamus*, solicitaron que la Opinión del Secretario de Justicia fuera considerada como su contestación a la demanda. El tribunal accedió a lo solicitado. Con respecto a la acción de Noriega Rodríguez, los codemandados *se allanaron* al decreto de inconstitucionalidad según solicitado por el demandante.

El tribunal de instancia acogió los planteamientos de Noriega Rodríguez y de los codemandados. Dictó sentencia en la que declaró inconstitucionales las Resoluciones Conjuntas Núms. 94 y 111 y aquellas otras resoluciones similares de "barril de tocino", aprobadas en años anteriores, por entender que su esquema de distribución de fondos: (1) violentaba el principio de separación de poderes, ya que constituía una intromisión indebida del poder legislativo en los atributos y deberes del Ejecutivo y una tentativa de usurpación de los mismos, y (2) dificultaba la fiscalización del uso de los fondos públicos y propiciaba el mal uso de éstos. Emitió auto de *injunction* permanente contra el Administrador de la A.S.M. y le ordenó cumplir con las normas establecidas en su dictamen de cómo habrían de redactarse futuras resoluciones que asignaren fondos públicos.[7]

De este dictamen acudieron ante nos los Representantes de la Cámara electos por el Partido Popular Democrático (en adelante P.P.D.) y la A.S.M. Los primeros esbozan que el tribunal de instancia erró: al denegar el auto de *mandamus*; al decretar la inconstitucionalidad de las referidas resoluciones conjuntas; al entender en una controversia no justiciable —por no existir un caso y controversia, por ser una opinión consultiva y por tratarse de una cuestión política— y al excederse en sus prerrogativas, dic-

---

[7] No obstante el hecho de que el magistrado, en su dictamen, reconoció la procedencia del auto de *mandamus* en tanto en cuanto el Gobernador no tenía potestad alguna para paralizar el desembolso de los fondos objeto de las Resoluciones Conjuntas Núms. 94 y 111 una vez éste sancionó las mismas y de que éste venía obligado a cumplir y hacer cumplir las leyes, procedió a desestimarlo por entender que los planteamientos constitucionales de la petición de sentencia declaratoria conllevaban que se tomase otro curso de acción.

tando un remedio declaratorio adicional que tuvo el efecto de limitar las facultades de la Rama Legislativa y Ejecutiva. La A.S.M., por su parte, *no* cuestiona la declaración de inconstitucionalidad emitida por el tribunal a quo; más bien ataca los "remedios accesorios" contenidos en la sentencia emitida por el foro de instancia. Indican que éstos son inválidos por cuanto constituyen una invasión de la Rama Judicial en las prerrogativas constitucionales de la Rama Legislativa y Ejecutiva·y una opinión consultiva.

Expedimos ambos recursos. Ordenamos su consolidación mediante Resolución de fecha 10 de enero de 1990. Todas las partes han comparecido. Analizamos primeramente la justiciabilidad de los recursos ante nos; esta norma de autolimitación y de prudencia en el ejercicio del Poder Judicial nos impone el deber de examinar si los casos que traban una controversia de índole constitucional cumplen con determinados e indispensables requisitos previo a una expresión de este Foro sobre los méritos de dicho planteamiento.

## II

Es norma reiterada en nuestra jurisdicción, así como en la jurisdicción federal, que los tribunales de justicia requieren la existencia de un caso o controversia real para el ejercicio válido de su Poder Judicial. Esta limitación al Poder Judicial —ya sea por imperativo constitucional y/o jurisprudencial— surge de una *doble realidad*, a saber, que los tribunales sólo pueden decidir cuestiones presentadas en un contexto adversativo, capaz de ser resueltas a través de un proceso judicial; y la restricción que surge de una división tripartita en un Gobierno de forma republicana, diseñada para asegurar que la Rama Judicial no intervendrá en áreas sometidas al criterio de otras ramas de gobierno. *Com. de la Mujer v. Srio. de Justicia,* 109

D.P.R. 715 (1980); *Flast v. Cohen*, 392 U.S. 83 (1968). Véase, además, H.N. Padilla Martínez, *El poder judicial en Puerto Rico: su estructura, funciones y limitaciones*, 50 (Núms. 3–4) Rev. Jur. U.P.R. 357, 435 (1981).

■ Desde hace más de tres décadas, en *E.L.A. v. Aguayo*, 80 D.P.R. 552, 558–559 (1958), expresamos que la autoridad de nuestros tribunales provenía "del elemental principio de que los tribunales existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen un interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". La controversia planteada ante los tribunales ·debe ser una "definida y concreta" que afecte las relaciones jurídicas entre las partes que tienen un interés jurídico antagónico; debe ser una real y substancial que permita un remedio específico mediante una sentencia de carácter concluyente. *E.L.A. v. Aguayo*, ante.

■ La jurisprudencia nos señala que un asunto no es justiciable, cuando: se trata de resolver una cuestión política;[8] cuando una de las partes no tiene capacidad jurídica para promover un pleito;[9] cuando después de comenzado un pleito, hechos posteriores lo convierten en académico;[10] cuando las partes buscan obtener una "opinión consultiva",[11] o cuando se promueve un pleito que no

---

[8] *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958). Véanse: *Powell v. McCormack*, 395 U.S. 486 (1969); *Baker v. Carr*, 369 U.S. 186 (1962).

[9] *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980). Véanse: *Flast v. Cohen*, 392 U.S. 83 (1968); *Baker v. Carr*, ante.

[10] *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *Com. de la Mujer v. Srio. de Justicia*, ante; *E.L.A. v. Aguayo*, ante.

[11] *Com. de la Mujer v. Srio. de Justicia*, ante; *E.L.A. v. Aguayo*, ante. Véase *Flast v. Cohen*, ante.

está maduro.[12] Veamos.

## III

*Cuestión política*

■ La falta de justiciabilidad por alegadamente existir una cuestión política en casos como el de autos, en que existe un reclamo por parte de una rama de gobierno hacia la otra —sea la Ejecutiva o Legislativa— debe proceder de un análisis de la teoría de separación de poderes y del tipo de acción legislativa envuelta.[13] La doctrina de cuestión política plantea, en esencia, "que hay asuntos que no son susceptibles de determinación judicial porque su resolución corresponde a las [otras] ramas ... del gobierno —la legislativa o la ejecutiva— o, en última instancia, al electorado". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 679. Véanse: *Baker v. Carr*, 369 U.S. 182 (1962); *Powell v. McCormack*, 395 U.S. 486 (1969).

■ Como bien señala el profesor Serrano Geyls, existen tres (3) vertientes de la doctrina de cuestión política, a saber: (1) la que requiere que los tribunales no asuman jurisdicción sobre un asunto porque éste ha sido asignado textualmente por la Constitución a otra rama del Gobierno; (b) aquella según la cual las cortes deben de abstenerse de intervenir, bien porque no existan criterios de decisión susceptibles de descubrirse y administrarse por los tribunales, o bien por la presencia de otros factores análogos, y (c) la que aconseja la abstención judicial por consideraciones derivadas de la prudencia. Esta doctrina de cuestión política ha sido ampliamente discutida tanto en la jurisdicción federal como por este Tribunal.

---

[12] *Com. de la Mujer v. Srio. de Justicia*, ante; *Asoc. Guardias Penales v. Srio. de Justicia*, 87 D.P.R. 711 (1963). Véanse: *O'shea v. Littleton*, 414 U.S. 488 (1974); *Boyle v. Landry*, 401 U.S. 77 (1971); *Flast v. Cohen*, ante.

[13] Nota, *Congressional Access to the Federal Courts*, 90 (Núm. 8) Harv. L. Rev. 1632, 1645 (1977).

En 1962 el Tribunal Supremo de Estados Unidos delimitó los contornos de la doctrina de cuestión política en *Baker v. Carr*, ante. En este caso los demandantes alegaban que la distribución electoral existente en sus distritos legislativos de Tennessee violaba la igual protección de las leyes porque causaba la dilusión de sus votos. Sostenían que por no prorratearse los escaños legislativos desde 1901, según los últimos censos poblacionales, el 37% de los votantes escogía veinte (20) de los treinta y tres (33) senadores y 40% elegían sesenta y tres (63) de los noventa y nueve (99) representantes. Al resolver las cuestiones planteadas, el Tribunal Supremo estableció los criterios aplicables a la doctrina de cuestión política.

El referido Tribunal expresó que existía una cuestión política, *no* suceptible de adjudicación judicial, cuando había: (1) una delegación expresa del asunto en controversia a otra rama del Gobierno; (2) ausencia de criterios o normas judiciales apropiadas para resolver la controversia; (3) imposibilidad de decidir sin hacer una determinación inicial de política pública que no le corresponde a los tribunales; (4) imposibilidad de tomar una decisión sin expresar una falta de respeto hacia otra rama de gobierno; (5) una necesidad poco usual de adherirse, sin cuestionar, a una decisión política tomada previamente, y (6) potencial de confusión proveniente de pronunciamientos múltiples de varios departamentos del Gobierno sobre un punto.[14] En *Baker v. Carr*, ante, se expresó, además, que el mero hecho de que un pleito buscara la protección de un derecho político, no quería decir que el mismo presentara una cuestión política.

Años más tarde, en *Powell v. McCormack*, ante, el Tribunal Supremo federal volvió a discutir ampliamente la

---

[14] Véanse, además: *Allen v. Wright*, 468 U.S. 737 (1984); *INS v. Chadha*, 462 U.S. 919 (1983); *Goldwater v. Carter*, 444 U.S. 996 (1979); *United States v. Nixon*, 418 U.S. 683 (1974); *Gilligan v. Morgan*, 413 U.S. 1 (1973); *North Carolina v. Rice*, 404 U.S. 244 (1971); *Powell v. McCormack*, ante; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937); *Flast v. Cohen*, ante.

referida doctrina. En este caso, a un representante electo por un distrito de Nueva York no se le permitió juramentar a su cargo, decisión tomada por la Cámara de Representantes por recomendación de una Comisión Especial creada para determinar si éste podía ocupar su escaño. El Tribunal Supremo resolvió que la Cámara de Representantes no tenía facultad alguna para excluir a un congresista, debidamente electo, de su escaño excepto en caso de que éste no cumpliese con los requisitos constitucionales respecto a edad, ciudadanía y residencia. Al plantearse que la controversia no era justiciable por referirse a una cuestión política, el Tribunal expresó que si la Constitución le confería una facultad expresa a una rama de gobierno y ésta era de naturaleza política, no estaría sujeta a revisión judicial *salvo* que ésta se ejecutare incorrectamente afectando derechos constitucionales de igual jerarquía. Esta doctrina fue ratificada en *United States v. Nixon*, 418 U.S. 683 (1974).[15]

En Puerto Rico, la doctrina de cuestión política fue ampliamente discutida en *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). En dicho caso se impugnaba la actuación del Senado de Puerto Rico de no permitirle a un Senador tomar posesión de su cargo hasta que se dilucidara una moción de impugnación de la validez de las actas y certificados de elección de dicho senador. La controversia giró en torno a la Sec. 9 del Art. III de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 340, la cual establece que "[c]ada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección ...". Al discutir la justiciabilidad del recurso, este Tribunal expresó que la función de ser el "intérprete final de la Constitución le corresponde [al poder judicial y la] definición de sus contornos y la determinación de la

---

[15] Diversos comentaristas y profesores han propuesto varios *tests* para la aplicación de esta doctrina. Véanse: 1 *Treatise on Constitutional Law: Substance and Procedure* págs. 196–198 (1987); F.W. Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 (Núm. 4) Yale L.J. 517 (1966), entre otros.

validez de su ejercicio son asuntos cuidadosamente reservados a los tribunales". *Santa Aponte v. Srio. del Senado*, ante, pág. 759.[16]

Más recientemente, en *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986),[17] al reafirmar la doctrina de cuestión política expuesta en *Santa Aponte v. Srio. del Senado*, ante, rechazamos la contención de la parte demandada a los efectos de que este Tribunal estaba impedido de intervenir en dicha controversia por no ser ésta justiciable debido a que constituía una cuestión política. A esos fines expresamos:

> En todas las ocasiones anteriores ante reclamos de cuestión política hemos reafirmado el poder de los tribunales de ser los intérpretes finales de los contornos de la Constitución y para determinar si los actos de una rama de gobierno exceden su autoridad constitucional. *Marbury* v. *Madison*, 1 Cranch 137 (1803); *Santa Aponte* v. *Srio. del Senado*, supra. La interpretación inicial que de la Constitución haga otra rama merece deferencia, pero debe prevalecer la norma de que la determinación final corresponde a los tribunales. *United States* v. *Nixon*, supra. Nuestra estructura de gobierno no permite que las ramas políticas del Gobierno se conviertan en árbitros de sus propios actos. *Silva v. Hernández Agosto*, ante, pág. 55.

■ En *Silva v. Hernández Agosto*, ante, pág. 53, además, al discutir los orígenes de la doctrina de cuestión política, este Tribunal adoptó los criterios esbozados en *Baker v. Carr*, ante, los cuales enumeramos anteriormente.[18]

---

[16] El Tribunal citó en apoyo de sus expresiones: *Baker v. Carr*, ante; *United States v. Nixon*, ante; *Bond v. Floyd*, 385 U.S. 116 (1966); *Kilbourn v. Thompson*, 103 U.S. 168 (1880); *Powell v. McCormack*, ante; *Marbury v. Madison*, 5 U.S. 137 (1803).

[17] En *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986), varios legisladores del Partido Nuevo Progresista impugnaron el Reglamento del Senado de Puerto Rico sobre la investigación de los hechos ocurridos en 1978 en el Cerro Maravilla. Dicho reglamento limitaba el acceso de la minoría parlamentaria a las sesiones ejecutivas de la comisión constituida para esos fines.

[18] Esta doctrina ha sido reiterada subsiguientemente. Véanse: *Nogueras v. Hernández Colón*, 127 D.P.R. 405 (1990); *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780 (1982); *P.I.P. v. E.L.A.*, 109 D.P.R. 685 (1980); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978); *Com. de la Mujer v. Srio. de Justicia*, ante, pág. 722.

*En los casos consolidados de epígrafe, la controversia planteada conlleva, en esencia, delinear los contornos que la Constitución de Puerto Rico le ha conferido a las Ramas Legislativa y Ejecutiva con respecto a los poderes de cada una de hacer y de poner en vigor las leyes.* Los legisladores del P.P.D. alegan que el Gobernador actuó en contra de los preceptos constitucionales al negarse a poner en vigor una ley y por adjudicarse facultades judiciales al determinar que las resoluciones conjuntas aquí impugnadas eran inconstitucionales. Por otra parte, el Gobernador alegó que dichas resoluciones son inconstitucionales por ser aprobadas bajo un esquema legislativo que violenta el principio de separación de poderes.([19])

■ Ante un reclamo de inconstitucionalidad de una ley, es la Rama Judicial la llamada a determinar la validez de la misma. Ni los cuerpos u organismos legislativos ni los funcionarios ejecutivos pueden convertirse en jueces de sus propios actos. Son los tribunales los llamados a ser los *intérpretes finales* de la Constitución y de las leyes que rigen nuestro País. *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368 (1984); *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Com. de la Mujer v. Srio. de Justicia*, ante; *Santa Aponte v. Srio. del Senado*, ante; *E.L.A. v. Aguayo*, ante.([20]) *Resolvemos*, en consecuencia, que los casos del epígrafe *no* plantean una "cuestión política" que nos impida ejercer nuestra función judicial.

---

([19]) Cabe señalar que los legisladores también alegan que los "remedios accesorios" diseñados en la sentencia del tribunal de instancia constituyen una invasión de la Rama Judicial en las prerrogativas constitucionales de las otras ramas de gobierno.

([20]) Desde *Marbury v. Madison*, ante, se ha reconocido que el Poder Judicial es el intérprete final de la Constitución y de las leyes. Alexander Hamilton en sus escritos titulados: *The Federalist*, Nueva York, Arlington House, 1966, expresó: "que los cuerpos legislativos no pueden convertirse en los jueces constitucionales de sus propios actos y es a los tribunales a quienes les toca interpretar la ley y la Constitución." (Traducción nuestra.)

# IV

*Legitimación activa de los legisladores*

En ningún momento ante el tribunal a quo, o ante este Foro, se ha cuestionado la legitimación activa de los legisladores promoventes de los casos consolidados de epígrafe. Tal omisión, sin embargo, no impide el que este Tribunal examine *sua sponte* si estos demandantes poseen legitimación activa para solicitar un remedio judicial.[21] Tenemos la obligación de cerciorarnos de que las partes que suscitan la controversia están particularmente capacitadas para así hacerlo y de que su interés es uno "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 413 (1982). Véanse: *Flast v. Cohen*, ante; *Baker v. Carr*, ante; L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 150.

Esta doctrina, pues, exige que el promovente de la acción demuestre que cumple con determinados requisitos indispensables, a saber: (1) que ha sufrido un daño claro y palpable; (2) que el daño es real, inmediato y preciso y no uno abstracto o hipotético; (3) que la causa de acción debe surgir bajo el palio de la Constitución o de una ley, y (4) que exista una conexión entre el daño sufrido y la causa de acción ejercitada. *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980); *Hernández Agosto v. Romero Barceló*, ante, pág. 414; *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992).

Con respecto al caso particular de los legisladores, existen diversas instancias bajo las cuales este Tribu-

---

[21] Véase *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992).

nal, en el pasado, le ha reconocido legitimación activa a un legislador para incoar su acción. Se observa que le hemos permitido defender un interés individual tradicional vinculado con el proceso legislativo e invocado frente a funcionarios de dicho Cuerpo tanto en su calidad individual de legislador como en representación de un grupo de dicho Cuerpo. A modo de ejemplo, en *Santa Aponte v. Srio. del Senado*, ante, este Foro le confirió legitimación activa a un Senador de Distrito para impugnar el intento de dicho cuerpo de excluirle de su escaño mientras se determinaba si éste había sido electo válidamente. En *Silva v. Hernández Agosto*, ante, también se permitió que unos Senadores, en representación de una minoría política de dicho cuerpo, cuestionaran una regla senatorial que alegadamente coartaba sus derechos constitucionales a participar en las etapas esenciales y significativas de los procesos investigativos o deliberativos en las comisiones de ese cuerpo.

De igual manera, tradicionalmente se ha reconocido que un legislador tiene legitimación activa, como representante oficialmente autorizado por dicho cuerpo, para impugnar una actuación ilegal del ejecutivo. En este contexto, también hemos reconocido que un legislador tiene legitimación activa para vindicar un interés personal en el ejercicio pleno de sus funciones legislativas afectadas por actuaciones u omisiones del poder ejecutivo. Tribe, *op. cit.*, pág. 150. Ejemplo de lo antes expuesto lo es el caso de *Hernández Agosto v. Romero Barceló*, ante. Allí el Presidente del Senado, autorizado por una resolución de dicho Cuerpo, radicó un *mandamus* para ordenar al Gobernador a enviar al Senado, para su consejo y consentimiento, las nominaciones de aquellos funcionarios del Gabinete gubernamental que éste había decidido retener para su segundo término en la Gobernación. Este Tribunal le reconoció legitimación activa, tanto en su capacidad de Presidente del Senado para comparecer a nombre del Cuerpo, así como en su carácter individual de legislador, por entender que como

miembro del Senado, tenía "un legítimo interés en participar en el ejercicio de la función constitucional de ese cuerpo de consejo y consentimiento. La omisión del alegado deber del Gobernador de enviar la nominación al Senado ciertamente le impediría intervenir en el proceso de confirmación y menoscabaría sus funciones constitucionales como senador". Íd., pág. 415. Conforme a ello, se concluyó que "los legisladores en su condición de miembros de la Asamblea Legislativa tienen capacidad jurídica para vindicar sus prerrogativas y funciones constitucionales tales como, en este caso, la participación de los miembros del Senado en el proceso de confirmación alegadamente menoscabada por el Gobernador". Íd., pág. 416.[22]

Los requisitos exigidos a un legislador, conforme a la doctrina de legitimación activa, fueron recientemente avalados por este Tribunal en dos casos. En el primero de éstos, *Hernández Torres v. Gobernador*, ante, dos Representantes de la Cámara, por sí y en representación de la entonces minoría del Partido Nuevo Progresista (en adelante P.N.P.) de dicho cuerpo legislativo, impugnaron la constitucionalidad de la Resolución Conjunta de Presupuesto de Mejoras Capitales y Gastos de Funcionamiento del Estado Libre Asociado (en adelante E.L.A.) *en defensa del interés público*. Una mayoría de este Tribunal determinó que los legisladores promoventes no tenían legitimación activa para impugnar una ley en representación de sus votantes o del interés público *en vista de que el agravio alegado era uno de índole general y no uno para vindicar un interés personal vinculado con el ejercicio de sus prerrogativas y funciones legislativas*. Se indicó que los legisladores, a base de un perjuicio general, pretendían que los tribunales revocaran una decisión aprobada por mayoría en un proceso democrático en el que no hubo menoscabo al-

---

[22] Véanse, además: *Peña Clos v. Cartagena Ortiz*, ante; *Nogueras v. Hernández Colón*, ante; *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); Nota, *Congressional Access to the Federal Courts*, ante, págs. 1641–1642.

guno de sus prerrogativas legislativas, por lo que éstos no podían trasladar al foro judicial el debate legislativo en el que no pudieron persuadir a sus colegas de los méritos de su postura. Íd., págs. 841–842.

En dicho caso, los demandantes alegaron, como parte de sus prerrogativas legislativas afectadas por la ley impugnada, "el derecho y el deber de fiscalizar la obra pública y el funcionamiento del Gobierno ...". *Hernández Torres v. Gobernador*, ante, pág. 843. La Opinión mayoritaria de este Tribunal rechazó tal contención. A esos efectos, se concluyó que tales prerrogativas no fueron lesionadas dado que los demandantes ejercieron su función fiscalizadora a cabalidad en dicho cuerpo; éstos tuvieron los instrumentos necesarios e igualdad de oportunidades en todas las etapas significativas del proceso legislativo, defendieron sus posturas y participaron a plenitud en el mismo. Íd., pág. 846.

En el subsiguiente caso de *Hernández Torres v. Hernández Colón et al.*, ante, la demandante Hernández Torres, en su condición de Representante a la Cámara, impugnó la constitucionalidad de la Ley del Departamento de Asuntos de la Comunidad Puertorriqueña (en adelante D.A.C.P.). Alegó que la asignación de fondos al D.A.C.P., por estar sito fuera de los límites territoriales de la isla, " 'le est[aba] causando un daño inmediato e irreparable al pueblo de Puerto Rico' " y que sus prerrogativas legislativas se estaban viendo afectadas por tener que " 'legislar para la consideración y asignación de recursos a un departamento gubernamental creado mediante la aprobación de una ley inconstitucional' ". Íd., pág. 597.

▮ Nuevamente, una mayoría de este Tribunal le denegó legitimación activa a la legisladora demandante.[23]

---

[23] Se señaló que para que un legislador ostente legitimación activa en un pleito deberá: (1) demostrar que ha sufrido un daño claro e inmediato a sus prerrogativas legislativas; (2) demostrar que no se trata de prerrogativas abstractas ajenas al ejercicio de sus funciones legislativas sino, más bien, aquellas prerrogativas que tiene todo legislador a ejercitar plenamente su derecho constitucional a legislar según dispuesto por la Sec. 1 del Art. III de nuestra Constitución, L.P.R.A., Tomo 1, y

Se reiteró la normativa sentada en el caso previo a los efectos de que un legislador *no* podrá acreditar su legitimación activa con sólo alegar que sus prerrogativas legislativas se veían afectadas por no permitírsele fiscalizar adecuadamente la obra legislativa y se indicó que esta función fiscalizadora sólo envolvía "los mecanismos razonables y necesarios que [hicieran] viabl[e] su participación plena en todas las etapas críticas del proceso legislativo". *Hernández Torres v. Hernández Colón et al.*, ante, pág. 602. Conforme a ello, se concluyó que no se le estaba causando un daño claro e inmediato a las prerrogativas legislativas de la demandante; que ésta no estaba privada de ejercer su voto en contra de aquella legislación que a su juicio fuera perjudicial para el País ni de convencer a los demás legisladores de los defectos de tal legislación. Por lo que la demandante no podía trasladar al foro judicial su intento fallido en el proceso legislativo válido en aras de ser allí victoriosa debido a que ello tendría el efecto de trastocar la separación de poderes de nuestra Isla. Íd., pág. 604. *Dichas decisiones constituyen la norma imperante en esta jurisdicción.*

Expresa el profesor Tribe que la categoría de legitimación activa antes examinada es la que más problemas ha causado para el desarrollo de una doctrina coherente en el caso particular de los legisladores. La dificultad en estos casos estriba en precisar cuál, o cuáles, son las prerrogativas que validan reconocer una acción de un legislador particular —que no goza del apoyo de uno o los dos cuerpos legislativos— y que se han visto afectados por el Poder Ejecutivo. Tribe, *op. cit.*, pág. 152. Véase, también, J.J. Álvarez González, *Análisis del término del Tribunal Supremo 1990-1991—Derecho Constitucional*, 61 (Núm. 4) Rev. Jur. U.P.R. 637, 644 (1992). El Tribunal Supremo federal *no* ha

---

(3) probar la conexión entre el daño sufrido y la acción que pretende ejercitar, no pudiendo basar sus alegaciones en que acude al tribunal en representación de sus constituyentes para vindicar un interés general. *Hernández Torres v. Hernández Colón et al.*, ante, págs. 600–601.

pautado los criterios en torno a dicha norma.[24] Tanto los tribunales federales,[25] como los comentaristas en este ámbito,[26] discrepan marcadamente en cuanto a si debe conferírsele legitimación activa a un legislador particular. Algunas de las objeciones reconocidas en la jurisdicción federal para negarle legitimación activa a un legislador particular fueron esbozadas y adoptadas en los casos antes citados de *Hernández Torres v. Gobernador*, ante, y *Hernández Torres v. Hernández Colón et al.*, ante. No obstante estas instancias, en la jurisdicción federal se le ha reconocido legitimación activa a un legislador particular cuando

[24] L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 153. *Treatise on Constitutional Law*, ante, pág. 147. La única ocasión en que ese Foro ha emitido opinión con relación al tema ante nos fue en *Coleman v. Miller*, 307 U.S. 433, 438 (1939), donde varios Senadores del estado de Kansas alegaron que la efectividad de sus votos en contra de la ratificación de una enmienda a la Constitución federal había sido "diluida" cuando hubo un empate en el Senado y el voto decisivo a favor de la ratificación lo dio el vicegobernador. Mediante su acción, los Senadores querían impedir que se contara dicho voto y que se considerase que la enmienda no había sido ratificada. El Tribunal Supremo le confirió legitimación activa a estos demandantes por entender que dichos Senadores tenían un interés directo y adecuado en mantener la efectividad de sus votos y que éstos tenían un derecho y un privilegio bajo la Constitución federal de que se les diera efectividad a sus votos. No obstante la decisión a la que llegó el Supremo federal en *Coleman v. Miller*, ante, no se establecieron en dicha opinión los criterios para determinar cuándo es que procede este tipo de acción.

En fechas más recientes este asunto ha sido objeto de discusión por las cortes federales inferiores pero *no* atendido por el Supremo federal. Véanse: *EPA v. Mink*, 410 U.S. 73, 75 esc. 2 (1973); *Goldwater v. Carter*, 617 F.2d 697 (Cir. D.C. 1979), dejado sin efecto por otras razones en 444 U.S. 996 (1979); *Idaho v. Freeman*, 459 U.S. 809 (1982), dejado sin efecto por académico; *Barnes v. Kline*, 759 F.2d 21 (Cir. D.C. 1985), dejado sin efecto por académico "sub nom" en *Burke v. Barnes*, 479 U.S. 361 (1987).

[25] *Holtzman v. Schlesinger*, 484 F.2d 1307 (2do Cir. 1973); *Mitchell v. Laird*, 488 F.2d 611 (Cir. D.C. 1973); *Kennedy v. Sampson*, 511 F.2d 430 (Cir. D.C. 1974); *Harrington v. Schlesinger*, 528 F.2d 455 (4to Cir. 1975); *Harrington v. Bush*, 553 F.2d 190 (Cir. D.C. 1977); *Goldwater v. Carter*, ante; *American Federation of Gov. Employees v. Pierce*, 697 F.2d 303 (Cir. D.C. 1982); *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375 (Cir. D.C. 1984); *Dennis v. Luis*, 741 F.2d 628 (3er Cir. 1984); *Barnes v. Kline*, ante, entre otros.

[26] *Congressional Standing to Challenge Executive Action*, 122 (Núm. 5) U. of Pa. L. Rev. 1366 (1974); C. McGowan, *Congressmen in Court: The New Plaintiffs*, 15 (Núm. 4) Ga. L. Rev. 241 (1981); *Standing versus Justiciability: Recent Developments in Participatory Suits Brought by Congressional Plaintiffs*, B.Y. U. L. Rev. 3171 (1982); E.A. Benck, *Standing for State and Federal Legislators*, 23 (Núm. 3) Santa Clara L. Rev. 811 (1983); Nota, *Congressional Access to the Federal Courts*, ante; R.L. Dessem, *Congressional Standing to Sue: Whose vote is this Anyway?*, 62 (Núm. 1) Notre Dame L. Rev. 1 (1986), entre otros.

éste ha demostrado la anulación de un voto pasado o futuro que puede ser razonablemente vinculada con la acción impugnada, *Kennedy v. Sampson*, 511 F.2d 430 (Cir. D.C. 1974);[27] *Goldwater v. Carter*, 617 F.2d 697 (Cir. D.C. 1979); *Barnes v. Kline*, 759 F.2d 21 (Cir. D.C. 1985), o cuando otros aspectos esenciales de sus prerrogativas legislativas están implicados. Tribe, *op. cit.*, pág. 153.

*Con ello en mente pasamos a examinar si los legisladores ante nos, en su carácter particular, poseen legitimación activa para incoar sus respectivas acciones.*

## A. *Representante Noriega Rodríguez*

A la luz de las alegaciones del demandante Noriega Rodríguez —las cuales resumimos en la nota al calce 6— concluimos que éste carece de legitimación activa para incoar la acción en que impugnó la constitucionalidad de las aludidas resoluciones conjuntas.

En primer lugar, debe señalarse que el Representante Noriega Rodríguez *no* se opuso a la aprobación de las Referidas Resoluciones Conjuntas, Núms. 891 y 356 de la Cámara de Representates y del Senado, respectivamente; *incluso votó a favor en una de ellas*, a saber la Núm. 891 de la Cámara.[28] En vista de que éste no combatió legislativamente dichas Resoluciones, somos del criterio que la aprobación de las mismas por el Honorable Gobernador no le causó un daño claro y palpable a sus prerrogativas legislativas. La acción de este último, firmando estas Resoluciones, no anuló el voto pasado del Representante No-

---

[27] En *Kennedy v. Sampson*, ante, se le dio legitimación activa a un Senador que alegaba que el Presidente le había causado un daño a sus prerrogativas legislativas al emitir un "veto de bolsillo" ilegalmente a una legislación que éste había apoyado.

[28] Cabe señalar que la R.C. de la C. Núm. 891 recibió 46 votos en la afirmativa en la Cámara de Representantes, incluyendo el voto afirmativo del aquí demandante Noriega Rodríguez (no hubo votos en la negativa o abstenciones). La R.C. del S. Núm. 356, por su parte, recibió 47 votos en la afirmativa en la Cámara de Representantes (sin votos en la negativa o abstenciones). Véase el Historial de las Medidas Radicadas y el Diario de Sesiones para estas resoluciones conjuntas.

riega; todo lo contrario, favoreció la posición que éste asumió en la aprobación de las referidas medidas. Tribe, *op. cit.*, pág. 151. Somos del criterio que el Representante Noriega Rodríguez no tiene legitimación activa para impugnar una ley, la cual él con su actuación legislativa favoreció.

En adición, entendemos que el fundamento en el cual descansa el legislador demandante no es otro sino el rol de fiscalización que éste, como Representante de minoría, ejerce ante el cuerpo legislativo. Conforme a la doctrina pautada en los casos citados de *Hernández Torres v. Gobernador*, ante, y *Hernández Torres v. Hernández Colón et al.*, ante, tal fundamento *per se* no era suficiente para conferirle la legitimación activa para radicar el pleito de epígrafe. Si bien Noriega Rodríguez hace un planteamiento de igual protección de las leyes predicado en la teoría de subinclusividad, éste aclara que esa no es su razón de pedir. De hecho, resultaría un tanto paradójico que la base de su solicitud fuera igual trato, esto es, que también se le permitiera recibir fondos de "barril de tocino", cuando el verdadero motivo de su acción es el erradicar esta práctica.

No hay indicios ni alegación alguna a los efectos de que al demandante Noriega Rodríguez, como Representante de minoría, se le hubiera coartado de ejercer su función fiscalizadora, mediante su participación activa y plena en todas las etapas críticas del proceso legislativo relacionado con las resoluciones conjuntas impugnadas.[29] Éste tuvo amplia oportunidad de rebatir y de tratar de convencer a sus compañeros legisladores de los defectos de las resoluciones conjuntas de marras, por lo que éste tuvo la oportunidad de ejercer a cabalidad la función fiscalizadora que como representante de minoría ostenta y a bien lleva. En vista de que no demostró haber sufrido un daño claro y palpable a tales prerrogativas y funciones legislativas, somos del

---

[29] *Hernández Torres v. Gobernador*, ante, pág. 846; *Hernández Torres v. Hernández Colón et al.*, ante, pág. 602.

criterio que el demandante Noriega Rodríguez carece de legitimación activa para incoar la acción de sentencia declaratoria.

B. *Representantes del Partido Popular Democrático*

Es de observar que la acción de *mandamus* instada contra el Gobernador, *por los Representantes del P.P.D.*, no se hace en representación de sus votantes ni en defensa del interés público. Dicha acción tampoco responde a aquella situación en que la parte no logró persuadir a sus colegas en el foro legislativo y recurre a los tribunales para impugnar la validez del estatuto aprobado no empece sus objeciones. Éstos, más bien, impugnan la alegada actuación inconstitucional del Gobernador de paralizar una resolución conjunta válidamente aprobada por ambos cuerpos legislativos y la que, a su vez, contenía un mandato que les concernía puesto que les asignaba determinada suma de dinero para que éstos dispusieren de ella en sus respectivos municipios en obras y mejoras permanentes, obras no permanentes, adquisición de equipo, compra de materiales y otras actividades de interés social. Sostienen que su acción va encaminada a "vindicar la función de la Asamblea Legislativa en cuanto al procedimiento para la aprobación de leyes y resoluciones conjuntas" y que de no emitirse el auto solicitado sufrirían daños irreparables "al no poder continuar con la obra de gobierno que le encomendó el Pueblo de Puerto Rico".

Las resoluciones conjuntas aquí impugnadas, le conferían a cada legislador una cantidad de dinero —la cual era reservada por la A.S.M.— para ser "distribuidos por éste en obras y mejoras permanentes y no permanentes en sus respectivos distritos". Sostienen que la actuación, alegadamente contradictoria, del Primer Ejecutivo, les ha causado *un daño claro e inmediato* en tanto en cuanto la paralización de los fondos objeto de la aludida resolución conjunta ha limitado la facultad y *el mandato que la propia pieza*

*legislativa les confería para distribuir los dineros de sus correspondientes municipios. Tal proceder privó a los legisladores de este mandato y les impidió. ejercer esta facultad legislativa.* En la medida en que los legisladores demandantes eran los "beneficiarios" o "receptores" de estos fondos y de que mediante el desembolso de los mismos en sus respectivos municipios adelantaban la obra de gobierno y encomienda que el Pueblo les impuso al votar por ellos, la aludida paralización les coartó de poder continuar con dicha labor y función.([30])

 Somos del criterio que los legisladores del P.P.D. *poseen* legitimación activa, tanto en su carácter particular como también como integrantes de la Cámara de Representantes, para incoar la acción de *mandamus* contra el Gobernador. *La congelación de estos fondos por parte del*

---

([30]) Los representantes del Partido Popular Democrático (en adelante P.P.D.), alegaron además que vienen en su carácter de miembros de la Cámara de Representantes, ya que consideran que ellos, al igual que sus compañeros legisladores, se vieron afectados por la actuación del Gobernador. La paralización de los fondos ordenada por el Primer Ejecutivo alegadamente constituyó una actuación ultra vires que tuvo el efecto práctico de anular una resolución conjunta válidamente aprobada por la Asamablea Legislativa y convertida en ley por firma del Gobernador.

Este Tribunal ha resuelto que la esencia de las prerrogativas legislativas es la garantía que tiene todo legislador a ejecutar plenamente su derecho constitucional a legislar, derecho comprendido en la Sec. 1 del Art. III de la Constitución de Puerto Rico. *Hernández Torres v. Hernández Colón et al.*, ante, pág. 601. La responsabilidad de promulgar las leyes es una compartida entre el Poder Legislativo y el Ejecutivo; el primero aprueba los proyectos de ley que se someterán a la firma del Gobernador. Éste las aprueba o las rechaza, en caso de que este último las rechaze, la pieza legislativa "muere" o por el contrario, se convierte en ley si al devolverse a la Legislatura el mismo es aprobado por dos terceras partes del número total de los miembros que componen cada cámara legislativa. Véase Sec. 19 de la Constitución de Rigual, *op. cit.*, pág. 112.

Los legisladores-recurrentes del P.P.D. —como participantes de este proceso constitucional de hacer las leyes— tienen legitimación activa para requerir que dicho mecanismo procesal se lleve a cabo, defendiendo así su derecho a legislar. Véase *Hernández Torres v. Hernández Colón et al.*, ante. La acción del Gobernador le ha causado un daño a las prerrogativas legislativas de los aquí demandantes porque estos últimos, aprobaron una ley mediante un proceso legislativo válido, que contó con la firma del Primer Ejecutivo, y la misma fue congelada, haciendo estéril y fútil todo el proceso envuelto. La acción del Gobernador de detener, congelar o no poner en vigor una ley, tiene el efecto práctico de anular una resolución conjunta *válidamente aprobada* por la Asamblea Legislativa y, el Primer Ejecutivo, por la cual los aquí demandantes votaron a favor. Tal proceder dejó sin efecto los votos emitidos mediante un ejercicio válido del poder legislativo en un proceso democrático. Véase *Kennedy v. Sampson*, ante; *Coleman v. Miller*, ante.

*Gobernador les ha causado un grave daño en sus perroga-*
*tivas legislativas, al alegadamente no permitirles adjudi-*
*car los fondos que por ley debidamente aprobada les corres-*
*pondía distribuir; violentando así el proceso legislativo*
*envuelto.*

## V

*Academicidad*

La jurisprudencia, tanto de Puerto Rico como la
de Estados Unidos, ha establecido que un caso, a pesar de
cumplir con todos los requerimientos de justiciabilidad,
puede resultar académico si por el transcurso del tiempo
ha causado que éste pierda su condición de controversia
viva y presente, característica que siempre ha de existir si
un tribunal quiere evitar opiniones consultivas en asuntos
abstractos de derecho.[31] Tribe, *op. cit.*, pág. 83. La doc-
trina de academicidad requiere que durante *todas* las eta-
pas de un procedimiento adversativo, incluyendo la etapa
de apelación o revisión, exista una controversia genuina
entre las partes. *DeFunis v. Odegaard*, 416 U.S. 312
(1974).

Las diferentes justificaciones que se esbozan para re-
querir que un caso no sea académico antes de resolverse el
mismo son: "(1) evitar el uso innecesario de los recursos
judiciales; (2) asegurar suficiente contienda adversativa
sobre las controversias para que sean competentes y vigo-
rosamente presentados ambos lados; (3) evitar un prece-
dente innecesario." *Com. de la Mujer v. Srio. de Justicia*,
ante, pág. 725. Véase Padilla Martínez, ante.[32]

---

[31] A esos mismos efectos, en *C.E.E. v. Depto. de Estado*, ante, pág. 935, dijimos:
"Los tribunales pierden su jurisdicción sobre un caso por academicidad cuando
ocurren cambios durante el trámite judicial de una controversia particular que ha-
cen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el
tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia."

[32] De igual forma, Serrano Geyls nos señala que el peligro de expresarse sobre
un caso en que los hechos lo han tornado académico es que la "decisión puede aca-

■ En *E.L.A. v. Aguayo*, ante, pág. 584, expresamos que un caso académico

> ... es "uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado, *o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente*["]. (Énfasis suplido.)

En *Com. de la Mujer v. Srio. de Justicia*, ante, se definió claramente lo que constituía un caso académico, al expresarse que es aquel donde el paso del tiempo ha hecho que un caso pierda su carácter como una controversia viva; es decir, donde los cambios fácticos o judiciales, acaecidos durante el trámite judicial, tornan en ficticia su solución. Como nos expresa el profesor Tribe, *op. cit.*, pág. 62, el requisito de academicidad "examina" primordialmente la relación entre eventos pasados y el reclamo presente para determinar si todavía subsiste un caso o controversia. El caso académico carece de una materia sobre la cual el tribunal pueda expresarse. Serrano Geyls, *op. cit.*, pág. 122.([33])

■ El requisito de que un caso, para una determinación judicial, no sea académico, tiene sus excepciones, a saber: a) aquellas en que se plantea una cuestión recurrente que por su naturaleza hace muy difícil dilucidarla nuevamente en los tribunales,([34]) b) aquellas donde la situación de hechos ha sido cambiada por el demandado pero no tiene vicios de permanencia,([35]) c) aquellas que aparen-

---

rrear pérdida de tiempo, conflicto con otras ramas [de gobierno] y puede muy bien haber sido diseñada sin el beneficio de argumentos propios de partes adversas". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. C. Abo. P.R., 1986, Vol. I, pág. 122.

([33]) Véanse, además: Tribe, ante, pág. 62; *Treatise on Constitutional Law*, ante, pág. 57.

([34]) *Asoc. de Periodistas v. González*, ante; *Com. de la Mujer v. Srio. de Justicia*, ante. Véanse: *Roe v. Wade*, 410 U.S. 113 (1973); *Moore v. Ogilvie*, 394 U.S. 814 (1969).

([35]) *Asoc. de Periodistas v. González*, ante; *Com. de la Mujer v. Srio. de Justicia*, ante; *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953).

temente son académicas pero en realidad no lo son por sus consecuencias colaterales,([36]) y d) aquellas donde el tribunal ha certificado un pleito de clase y la controversia se tornó académica para un miembro de la clase, mas no para el representante de la misma.([37]) Ante el cuadro fáctico del caso de autos, somos del criterio que, ni la aprobación de la Ley Núm. 81 de 30 de agosto de 1991, conocida como la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, 21 L.P.R.A. sec. 4001 y ss., ni las elecciones pasadas, han tornado en académica la controversia ante nos.

El Art. 20.010 de la nueva Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico derogó la Ley Núm. 18 de 9 de agosto de 1974, según enmendada, conocida como la Ley de la Administración de Servicios Municipales.([38]) Esta ley derogada era la habilitadora de la entidad que recibía los fondos de barril de tocino, la A.S.M. No obstante tal derogación, el propio Art. 20.009 de la nueva ley dispuso que se transferiría a la Oficina del Comisionado de Asuntos Municipales "toda la propiedad, expedientes, documentos, equipo, suministros, obligaciones, fondos, partidas y cualesquiera otros pertenecientes o bajo la custodia de la Administración de Servicios Municipales". 1991 Leyes de Puerto Rico 675. El Cap. 237 de la nueva ley, 21 L.P.R.A. secs. 4901–4914, pauta todo lo concerniente a la nueva Oficina del Comisionado de Asuntos Municipales, las funciones y responsabilidades de esta

---

([36]) *Gobernador v. Alcalde de Coamo*, 131 D.P.R. 614 (1992); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Prod. T. Muñiz, Inc. v. Fernández*, 98 D.P.R. 52, 54 (1969). Véanse: *Sibron v. New York*, 392 U.S. 40 (1980); Nota, *The Mootness Doctrine in the Supreme Court*, 88 Harv. L. Rev. 373 (1974).

([37]) *El Vocero v. Junta de Planificación*, ante. Véanse: *Sosna v. Iowa*, 419 U.S. 393 (1975); *Franks v. Bowman Transportation Co.*, 424 U.S. 747 (1976).

([38]) Como bien se señala en *Berberena v. Echegoyen*, ante, págs. 872–873, al adjudicar una controversia se debe tomar en consideración la "ley tal y como se encuentra actualmente, no como estaba al momento de la adjudicación en primera instancia"; sin embargo, si a pesar de las enmiendas la nueva ley no resuelve la controversia o el asunto sometido, el tribunal apelativo retiene la jurisdicción sobre el caso.

entidad y las facultades y deberes del Comisionado de Asuntos Municipales. Mediante la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 estas nuevas figuras sustituyeron a la A.S.M. y a su Administrador, respectivamente. Se le confirieron más poderes administrativos y fiscales, cónsono con los mayores poderes que se le reconocieron a los municipios. A tenor con esta nueva ley, es ahora la Oficina del Comisionado de Asuntos Municipales la encargada de distribuir los fondos según las indicaciones de los legisladores envueltos.

A pesar del traspaso de funciones de A.S.M. a la nueva agencia, somos del criterio que en la medida en que puedan existir resoluciones conjuntas aprobadas bajo un alegado diseño violatorio de la separación de poderes y que atente contra la adecuada fiscalización de los fondos públicos, independientemente de qué departamento o entidad gubernativa sea recipiente de los dineros de las mismas, el caso no se ha tornado académico.

Por otro lado, los resultados eleccionarios de los previos comicios electorales tampoco hacen académica esta controversia. *Silva v. Hernández Agosto*, ante. Algunos de los demandantes aún ocupan escaños ante la Asamblea Legislativa; *los fondos aún se encuentran paralizados, por lo que de declararse constitucional la resolución conjunta ante nos, se levantaría la veda sobre éstos y ellos serían asignados a la Oficina del Comisionado de Asuntos Municipales y, esta entidad, a su vez, separaría las sumas designadas al legislador, quien se encargaría de distribuirlas en el municipio que lo eligió.*

## VI

*Opinión consultiva*

Procede analizar, si las expresiones de este Tribunal, disponiendo del recurso, se podrían considerar unas de carácter consultivas. La doctrina sobre "opinión consul-

tiva" establece, en esencia, que un tribunal *no* debe emitir una opinión sobre una controversia hipotética para beneficio de una o de ambas partes en un pleito en cuanto a una conducta futura.[39] Esta autorrestricción a la expresión judicial se basa en la concepción de que los tribunales no son un cuerpo asesor ni consultor, es decir, se trata de evitar que los tribunales emitan decisiones en el vacío, en abstracto o bajo una hipótesis especulativa. *Com. de la Mujer v. Srio. de Justicia,* ante; *E.L.A. v. Aguayo,* ante.[40]

Serrano Geyls, *op. cit.,* pág. 118, resume las razones que justifican esta limitación a la expresión judicial de la manera siguiente:

> ...(1) con toda probabilidad los tribunales pueden incurrir en error al dar opiniones consultivas porque los hechos concretos necesarios para un entendimiento cabal de la decisión que emiten se encuentran ausentes en esa etapa del procedimiento. También la ausencia de partes adversarias plantea el que las cuestiones a ser dirimidas no estén adecuadamente presentadas ante el tribunal; y (2) la necesidad de proteger los tribunales como institución que constituye una de las ramas de gobierno.[41]

En nuestra jurisdicción, en el caso de *E.L.A. v. Aguayo,* ante,[42] se discutió ampliamente dicha doctrina. Allí, este

---

[39] H.N. Padilla Martínez, *El poder judicial en Puerto Rico: su estructura, funciones y limitaciones,* 50 Rev. Jur. U.P.R. 357, 402 (1981).

[40] Los orígenes de esta doctrina en Estados Unidos se remontan a 1792, cuando Jueces Federales se negaron a contestar solicitudes del Congreso y del Secretario de Guerra sobre la ley de pensiones. Hayburn Case, 2 Dall 409 (1792). En 1793 el Presidente Washington remitió al Tribunal Supremo Federal 29 preguntas relacionadas al derecho internacional. Los jueces del Tribunal se negaron a emitir su opinión, señalando que lo solicitado era una cuestión extrajudicial, que le correspondía dilucidar a la rama ejecutiva. Véanse: Barret, *Constitutional Law,* 4ta ed., Ed. Foundation Press, 1977, pág. 30; *Treatise on Constitutional Law,* ante, pág. 97; Serrano Geyls, *op. cit.,* pág. 116. Véase, además, *C. & S. Air Lines v. Waterman Corp.,* 333 U.S. 103 (1942); *Muskrat v. United States,* 219 U.S. 346 (1911); F. Frankfurter, *A Note on Advisory Opinions,* 37 Harv. L. Rev. 1002 (1924).

[41] Citando a J.E. Nowak, R.E. Rotunda y J.N. Young, *Constitutional Law,* 2da ed., Minneapolis, Ed. West Pub. Co., 1983, pág. 64.

[42] En *E.L.A. v. Aguayo,* ante, mientras se cuestionaba la constitucionalidad de las leyes de Renovación Urbana en el Tribunal Supremo, uno de los abogados de récord manifestó a la prensa que el demandante había vendido su propiedad al Gobierno sin la necesidad de expropiación, hecho que daba base a la controversia.

Tribunal expresó que los foros judiciales debían estar alertas " 'para distinguir el caso ficticio o colusorio en el cual sólo se pretende obtener información o una opinión ...' ". *E.L.A. v. Aguayo*, ante, pág. 585. En este mismo caso, este Tribunal entendió que, por no existir interés de una de las partes en el pleito, procedía desestimar el recurso por no existir una controversia real.[43] Esta doctrina. fue reiterada en *Com. de la Mujer v. Srio. de Justicia*, ante, pág. 721, al expresar que no es función de los tribunales actuar como asesores o consejeros; que no se debe pasar juicio sobre una controversia hipotética para el beneficio de ambas partes en conducta futura y especulativa, sino que debe existir un debate legítimo en cuanto a los derechos de las partes. Por otro lado, en *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988), expresamos que cuando la controversia planteada en un caso no está completa o lista para su adjudicación, la opinión que emita este Tribunal es de naturaleza consultiva y es deber del Tribunal, dependiendo de las circunstancias del caso, desestimar el recurso desde su incepción o desestimar la revisión sin considerar los méritos de los planteamientos. Véanse: *E.L.A. v. Aguayo*, ante; Serrano Geyls, *op. cit.*, pág. 195.

En los casos de epígrafe *claramente nos encontramos ante una controversia viva y presente,* en la cual debemos determinar si la legislación de barril de tocino, según concebida, menoscaba la separación de poderes que debe existir en nuestro Gobierno. La controversia de índole constitucional, planteada en el caso de autos, se basa en unos hechos concretos y reales que afectan a partes opuestas ya que los fondos referentes a las referidas Resoluciones Con-

---

[43] Véanse, además: *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992); *Asoc. de Periodistas v. González*, ante; *El Vocero v. Junta de Planificación*, ante; *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204 (1986); *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, ante.

juntas aún se encuentran congelados esperando por una determinación de este Tribunal.([44])

## VII

*Pleito colusorio*

Por otro lado, cabe señalar que, como parte de las alegaciones de los representantes del P.P.D., estos aducen que el pleito incoado por el Representante Noriega Rodríguez, atacando la constitucionalidad de la referidas resoluciones conjuntas, es uno "colusorio".

■ Un "pleito colusorio" es aquel *donde no hay controversias entre las partes y el mismo se presenta con el fin de lograr una determinación judicial que sea obligatoria.* En éste, las partes o una de ellas, no tienen interés en el pleito y una de ellas tiene el dominio completo de ambos lados del litigio; el mismo es presentado con el único propósito de obtener una opinión de los tribunales sobre la constitucionalidad de una ley. Véase *E.L.A. v. Aguayo*, ante, págs. 584 y 585.([45])

■ La esencia de esta doctrina es evitar, en ausencia de una genuina controversia entre partes opuestas, la revisión de la validez de una acción legislativa. *United States v. Johnson*, 319 U.S. 302 (1943); Tribe, *op. cit.*, pág. 93. El elemento esencial de una controversia real lo constituye un interés opuesto o antagónico entre partes opuestas.

---

([44]) Véanse, además: *Molina v. C.R.U.V.*, 114 D.P.R. 295 (1983); *Mari Bras v. Alcaide*, 100 D.P.R. 506 (1972); *Pueblo ex rel. M.G.G.*, 99 D.P.R. 925 (1971); *Suárez Sánchez v. Tribunal Superior*, 92 D.P.R. 507 (1965); *E.L.A. v. Aguayo*, ante; *Walker v. Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698 (1951); *Spanish Am. Tobacco Co. v. Buscaglia*, 71 D.P.R. 991 (1950).

([45]) Cabe señalar que cuando se presenta un caso colusoriamente con el fin de obtener una opinión del tribunal, éste puede ordenar que se inicien procedimientos disciplinarios contra los abogados, si éstos estaban conscientes de tal situación. Véase *E.L.A. v. Aguayo*, ante.

*E.L.A. v. Aguayo*, ante. Sabido es que una ley sólo se puede declarar inconstitucional en un pleito donde hay partes opuestas, *Muskrat v. United States*, 219 U.S. 346 (1911), ya que el "choque" de ideas fomenta la discusión de las controversias ayudando así a los tribunales en la adjudicación de los casos. Véanse: *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375 (1980); *O'Shea v. Littleton*, 414 U.S. 488 (1974).([46])

El único caso en que, anteriormente, se ha discutido la doctrina de "pleito colusorio" en nuestra jurisdicción lo es *E.L.A. v. Aguayo*, ante. Allí, este Tribunal concluyó que dicho caso había sido presentado colusoriamente; basó su determinación, entre otros, en que: (a) la parte demandante gestionó el recurso con el único propósito de obtener una opinión del Tribunal sobre la constitucionalidad de las leyes de renovación urbana; (b) el demandado nunca había tenido ni tenía interés personal y real en el litigio e inclusive no quería seguirlo; (c) el demandante seleccionó al abogado del demandado y sufragó todos los gastos del litigio. Se expresó, además, que:

> "El tribunal debe estar alerta para distinguir el caso ficticio o colusorio en el cual sólo se pretende obtener información o una opinión, o en el cual el demandando aparece como una figura decorativa con el único propósito de darle jurisdicción, de aquellos en que hay derechos en controversia con el fin de lograr una determinación obligatoria." *E.L.A. v. Aguayo*, ante, pág. 585.

En la jurisdicción federal, el caso en que mejor se analiza la naturaleza del caso colusorio lo es el de *United States v. Johnson*, ante.([47]) En dicho caso, en la pág. 305, se

---

([46]) Véanse, además: *Brown v. Watkins Motors Lines, Inc.*, 596 F.2d 129 (5to Cir. 1979); *Dworman v. Mayor & Bd. of Aldermen, etc., Morristown*, 370 F. Supp. 1056 (1974); *Continental Assur. Co. v. Macleod-Stedman, Inc.*, 694 F. Supp. 449 (1988).

([47]) En ese caso el demandante alegó que la renta que pagaba como inquilino de una propiedad era en exceso del máximo dispuesto por la reglamentación federal conocida como *Emergency Prior Control Act*; por su parte, el demandado alegó que dicha regulación era inconstitucional. El Gobierno, defendiendo la constitucionalidad del reglamento, alegó que el caso era colusorio, ya que en el mismo el demandante había usado un nombre ficticio, no había pagado ni contratado su representación

define un "pleito colusorio" como aquel que carece de un sentido adversativo, donde no existe un antagonismo real en relación con los derechos a ser adjudicados, lo cual es una garantía esencial de la integridad de los procesos judiciales, e indispensable en la adjudicación de las controversias que envuelven asuntos constitucionales.[48]

En fin, la jurisprudencia, tanto del Tribunal Supremo de Puerto Rico como de los Estados Unidos, ha resuelto que un caso es colusorio cuando: una de las partes en un litigio se convierte en "dominus litis" de ambos lados, *E.L.A. v. Aguayo*, ante; bajo ciertas circunstancias, cuando las partes someten un caso con estipulaciones de hechos incongruentes con la realidad, *Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281 (1917); cuando ambas partes aceptan que determinado estatuto es constitucional, lo cual es el hecho central de la controversia. *Moore v. Board of Education*, 402 U.S. 47 (1971).[49]

En el caso de autos, la alegación de los representantes del P.P.D. de que el pleito radicado por Noriega Rodríguez es uno "colusorio" se basa en que no existe controversia entre las partes del litigio, ya que el demandante y el demandado —Gobernador de Puerto Rico— coincidieron en la apreciación que hizo el Secretario de Justicia sobre la alegada inconstitucionalidad de las resoluciones conjuntas. Por su parte, el Procurador General en su "informe" (réplica) adujo que dicho pleito no es uno "colusorio" porque el mismo debe estimarse como *íntimamente relacionado* con el pleito radicado por los representantes del P.P.D., en el cual ellos defendían la constitucionalidad de las mencio-

---

legal y más aún no había discutido con "su abogado" los pormenores del pleito. El Tribunal Supremo federal entendió que procedía desestimar el recurso por no existir una controversia real entre partes opuestas.

[48] Véanse, además: *Wood v. Georgia*, 450 U.S. 261 (1981); *United States v. Nixon*, ante; *Evers v. Dwyer*, 358 U.S. 202 (1958); Serrano Geyls, *op. cit.*, pág. 119; *Treatise on Constitutional Law*, ante, pág. 184.

[49] En la jurisdicción federal un caso es colusorio por el simple hecho de que una de las partes pague los honorarios de los abogados de todos los litigantes; en Puerto Rico no hemos adoptado esta teoría. *E.L.A. v. Aguayo*, ante; *Géigel v. Ramos*, 79 D.P.R. 862, 864 (1957).

nadas resoluciones conjuntas. Alegó que en *INS v. Chadha*, 462 U.S. 919, 940 (1983), ante una situación análoga en que el demandante y la agencia ejecutiva demandada estaban de acuerdo respecto a la inconstitucionalidad de la ley envuelta, el Supremo federal entendió que no procedía desestimar el recurso porque el Congreso había comparecido y ésta era la parte adecuada para defender la validez de un estatuto cuando la agencia de gobierno encargada de ejecutarlo, concurría con el demandante en cuanto a la inconstitucionalidad de la ley.([50])

En vista de la determinación a la que hemos llegado sobre la ausencia de legitimación activa del Representante Noriega Rodríguez para impugnar las referidas Resoluciones Conjuntas, realmente resulta innecesario pasar juicio sobre la alegación a los efectos de que el pleito radicado por éste es uno colusorio. La determinación de ausencia de legitimación activa dispone de dicho recurso.

*En resumen*, luego de analizar la justiciabilidad de los casos consolidados de epígrafe, concluimos: que procede desestimar el recurso radicado por el Representante Noriega Rodríguez (AC-89-839) porque dicho demandante carece de legitimación activa para incoar dicho pleito. *A contrario sensu*, el pleito presentado por los Representantes de la Cámara por el P.P.D. es uno justiciable ya que existe una controversia genuina surgida entre las partes opuestas con interés antagónico y en el cual este Tribunal puede emitir una decisión que afecte sus relaciones jurídicas. En vista a

---

([50]) Sabido es que, como regla general, un recurso no es justiciable cuando las partes "opuestas" desean precisamente el mismo resultado; dicho recurso carece, pues, de una controversia real. *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375 (1980); *Moore v. Board of Education*, 402 U.S. 47 (1971). En el caso de *Chadha, por excepción*, el Tribunal Supremo entendió que a pesar de que la agencia gubernamental encargada de poner en vigor la Ley de Inmigración había coincidido con el demandante sobre la inconstitucionalidad de aquella parte de la ley que le confería a la Cámara de Representantes federal pasar juicio sobre la determinación de dicha agencia, existía un caso o controversia entre las partes opuestas porque, de prevalecer constitucionalmente dicha ley, el demandante sería deportado. Señaló, además, que en dicho litigio existía parte adversa porque había comparecido el Congreso a defender la constitucionalidad de la ley.

lo antes expresado, procedemos a analizar los plantea-
mientos de derecho invocados por los Representantes del
P.P.D.

## VIII

Los legisladores apelantes radicaron un recurso de
*mandamus* contra el Gobernador para obligar a que éste
cumpliera con su deber ministerial de cumplir y hacer
cumplir las resoluciones conjuntas, referentes al "barril de
tocino", firmadas por éste el 17 de agosto de 1989.[51] Ale-
garon éstos que el Gobernador no tenía autoridad para
congelar los fondos asignados por ley para una obra de
gobierno y sostuvieron, además, que de reconocérsele esta
facultad al Primer Ejecutivo, equivaldría ello a otorgarle
un poder de "superveto", contrario a la Constitución de
Puerto Rico.

El *mandamus*, según lo define nuestra legisla-
ción, "es un auto altamente privilegiado dictado por el Tri-
bunal Supremo del Estado Libre Asociado, o por el Tribu-
nal Superior de Puerto Rico, a nombre de Estado Libre
Asociado de Puerto Rico, y dirigido a alguna persona o per-
sonas naturales, a una corporación o a un tribunal judicial
de inferior categoría, dentro de su jurisdicción requiriéndo-
les para el cumplimiento de algún acto que en dicho auto
se exprese y que esté dentro de sus atribuciones o deberes".
Art. 1 de la Ley estableciendo el auto de *mandamus* de 12
de marzo de 1903 (32 L.P.R.A. sec. 3421). Este recurso
"está concebido para obligar a cualquier persona, corpora-

---

[51] Como se señaló anteriormente, esta acción se radicó primeramente ante este
Tribunal; aunque el recurso fue transferido al Tribunal Superior, no debe haber duda
alguna en cuanto a nuestra facultad para dictar el auto de *mandamus* en jurisdicción
original. De acuerdo con la Sec. 5 del Art. V de la Constitución del Estado Libre
Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 357, "[e]l Tribunal Supremo ... podr[á]
conocer en primera instancia de ... aquellos recursos y causas que se determinen por
ley". El auto de *mandamus* es uno de dichos recursos. *Dávila v. Superintendente de
Elecciones*, 82 D.P.R. 264 (1960); Arts. 649 y 650 del Código de Enjuiciamiento Civil,
32 L.P.R.A. secs. 3421 y 3422.

ción, junta o tribunal inferior a cumplir un acto que la ley particularmente le ordena como un deber resultante de un empleo, cargo o función pública, cuando ese deber no admite discreción en su ejercicio, sino que es ministerial".[52] D. Rivé, *El Mandamus en Puerto Rico*, 46 (Núms. 1–4) Rev. C. Abo. P.R. 15, 19 (1985). Véase 32 L.P.R.A. secs. 3421 y 3422.

Entre los factores a tomarse en consideración, cuando se solicita de un tribunal la expedición de un auto de *mandamus*, están: el posible impacto que éste pueda tener sobre los intereses públicos que puedan estar envueltos; el evitar una intromisión indebida en los procedimientos del poder ejecutivo, y que el auto no se preste a confusión o perjuicios de los derechos de terceros. *Lutz v. Post Gobernador de Puerto Rico*, 14 D.P.R. 860 (1908). El factor de mayor importancia y peso es el del posible impacto al interés público. *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 906 (1975); D. Rivé, *Recursos Extraordinarios*, Programa de Educación Legal Continuada de la Universidad Interamericana de Puerto Rico, Facultad de Derecho, 1989. Como indica Rivé, *op. cit.*, pág. 101, "[a]ntes de radicarse la petición [de Mandamus], la jurisprudencia requiere, como condición esencial, que el peticionario le haya hecho un requerimiento previo al demandado para que éste cumpla con el deber que se le exige, debiendo alegarse en la petición, tanto el requerimiento como la negativa, o la omisión del funcionario en darle curso. Sólo se exime de este requisito: 1) cuando aparece que el requerimiento hubiese sido inútil e infructuoso, pues hubiese sido denegado si se hubiera hecho; ó 2) cuando el deber que se pretende

---

[52] Nuestra jurisprudencia ha definido un deber ministerial como aquel deber impuesto por la ley que no permite discreción en su ejercicio sino que es mandatorio e imperativo. *Álvarez de Choudens v. Tribunal Superior*, 103 D.P.R. 235, 241–242 (1975); *Espina v. Calderón, Juez, y Sucn. Espina, Int.*, 75 D.P.R. 76 (1953); *Partido Popular v. Junta de Elecciones*, 62 D.P.R. 745, 748 (1944); *Great Am. Indem. v. Gobierno de la Capital*, 59 D.P.R. 911, 913 (1942); *Pueblo v. La Costa, Jr., Juez*, 59 D.P.R. 179 (1941).

exigir es uno de carácter público; a diferencia de uno de naturaleza particular que afecta solamente el derecho del peticionario". (Escolios omitidos.)[53] La Ley estableciendo el auto de *mandamus* exige que el auto lo solicite la parte beneficiada o interesada en los actos cuya ejecución se trate de obtener por virtud de tal procedimiento, 25 L.P.R.A. sec. 3423, por lo que no existe problema de *standing*, pues la acción sólo la puede ejecutar la parte verdaderamente interesada. Rivé, *op. cit.*, pág. 99.

En Puerto Rico, nuestra casuística ha establecido que el Gobernador "está sujeto al auto de mandamus lo mismo que cualquier otro funcionario del departamento ejecutivo. Nuestro gobierno es un gobierno de ley y todos los funcionarios desde el más alto hasta el más inferior están obligados a obedecer la ley sin duda alguna". *Lutz v. Post Gobernador de Puerto Rico*, ante, págs. 869–870. Véanse, además: *Jiménez v. Reily*, 30 D.P.R. 626 (1922); *Pagán v. Towner*, 35 D.P.R. 1 (1926); *Romero Moreno v. Gore, Gobernador*, 46 D.P.R. 408 (1934); *Abella v. Piñeiro, Gobernador*, 66 D.P.R. 690 (1946); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1987, Cap. 17, págs. 131–135.[54] Es menester determinar, primeramente, si la ejecución de las aludidas Resoluciones Conjuntas es un deber ministerial impuesto al Gobernador —sea por Constitución o por ley— o por el contrario, si éste tiene el

---

[53] Véanse: *Medina v. Fernós, Comisionado*, 64 D.P.R. 857 (1945); *Urdaz v. Padín, Comisionado*, 48 D.P.R. 306 (1935); *Suárez v. Corte*, 65 D.P.R. 850 (1946); *Medina v. Fernós*, Comisionado, ante, pág. 860; *Espina v. Calderón, Juez, Sucn. Espina, Int.*, ante, pág. 81; *Martínez Nadal v. Saldaña*, 33 D.P.R. 721 (1924).

[54] No está en controversia el hecho de que los peticionarios han cumplido con todos los requisitos, formales y sustantivos del recurso de *mandamus*, a saber: los Legisladores del P.P.D. le hicieron un requerimiento previo al Gobernador para que pusiera en vigor las referidas resoluciones (véase Carta de 5 de septiembre de 1989 dirigida al Gobernador), la acción va dirigida contra un funcionario del Gobierno y la controversia planteada es una de un gran interés público.

poder de detener o congelar la ejecución de los mismos, estando esta decisión a discreción del Primer Ejecutivo.

## IX

La Sec. 18 del Art. III de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 345, establece que "toda resolución conjunta seguirá el mismo trámite de un proyecto de ley". A esos efectos, la Sec. 19 del Art. III de nuestra Constitución, ante, págs. 345–346, pauta el trámite que ha de seguir todo proyecto de ley, o resolución conjunta, una vez una mayoría del número total de los miembros que componen cada cámara lo aprueba:

> Cualquier proyecto de ley que sea aprobado por una mayoría del número total de los miembros que componen cada cámara se someterá al Gobernador y se convertirá en ley si éste lo firma o si no lo devuelve con sus objeciones a la cámara de origen dentro de diez días (exceptuando los domingos) contados a partir de la fecha en que lo hubiese recibido.
>
> Cuando el Gobernador devuelva un proyecto, la cámara que lo reciba consignará las objeciones del Gobernador en el libro de actas y ambas cámaras podrán reconsiderar el proyecto, que de ser aprobado por dos terceras partes del número total de miembros que componen cada una de ellas, se convertirá en ley.
>
> *Si la Asamblea Legislativa levanta sus sesiones antes de expirar el plazo de diez días de haberse sometido un proyecto al Gobernador, éste quedará relevado de la obligación de devolverlo con sus objeciones, y el proyecto sólo se convertirá en ley de firmarlo el Gobernador dentro de los treinta días de haberlo recibido.*
>
> Toda aprobación final o reconsideración de un proyecto será en votación por lista. (Énfasis suplido.)

Las alegaciones de la demanda de *mandamus* revelan que la Asamblea Legislativa levantó su sesión antes de expirar el plazo de diez días de habérsele sometido la R.C. de la C. Núm. 891 al Gobernador. Según la Sec. 19 de nuestra Constitución, antes citada, el Primer Ejecutivo tenía treinta días, luego de recibida la resolución conjunta, para considerarla y aprobarla de estar conforme con la misma.

Debido a que la Asamblea Legislativa había levantado su sesión, el Gobernador estaba relevado de la obligación de devolver la pieza con sus objeciones —de estar en desacuerdo con la misma— dentro del plazo de diez días. Bastaba con que no la firmara en el aludido plazo de treinta días y la legislación ante su consideración habría "muerto".[55] Mediante tal proceder, le habría dado un "veto de bolsillo" a la R.C. de la C. Núm. 891.

No obstante esta opción, y no obstante el hecho de que el Primer Ejecutivo contaba con el beneficio del resultado de la consulta que le había hecho al Secretario, el Gobernador firmó la aludida resolución conjunta adviniendo ésta la Resolución Conjunta Núm. 94 de la Cámara, *con toda la fuerza de ley que a dicha medida se le atribuye*. Claramente las Resoluciones Conjuntas Núm. 94 de la Cámara y Núm. 111 del Senado, de 17 de agosto de 1989, referentes al "Barril de Tocino", se convirtieron en ley, por lo que estas se ven afectadas por la disposición Constitucional que obliga al Gobernador a *"cumplir y hacer cumplir las leyes"*. (Énfasis suplido.) Sec. 4 del Art. IV de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 349. Las expresiones vertidas en la Convención Constituyente despojan toda duda de que dicha disposición constitucional "le impone un deber *ministerial* al Gobernador no tan sólo de hacer cumplir la ley *sino* también de cumplirla", por lo que éste, habiendo firmado la misma, tenía la obligación de darle curso al mandato impuesto por estas Resoluciones de distribuir los fondos asignados por ésta.[56]

---

[55] Rigual, *op. cit.*, págs. 109–110.

[56] A esos efectos, el Diario de Sesiones en la Convención Constituyente nos ilustra el debate habido:

"Sr. GONZALEZ BLANES: Para una enmienda, en la página 3, línea 3, eliminar las palabras 'cumplir y' de modo que quede, 'Hacer cumplir las leyes'. O sea, entre los deberes, funciones y atribuciones del Gobernador, técnicamente, la obligación que tiene el Gobernador es la de hacer cumplir la ley.

. . . . .

"Sr. QUIÑONEZ: Quiero que lo exprese claro, 'cumplir y hacer cumplir las leyes'. Nos oponemos a la enmienda del compañero, y que se vote.

No obstante el Gobernador tener el deber ministerial de dar cumplimiento a la ley, éste se atribuyó el poder de congelar los fondos asignados por estas Resoluciones Conjuntas. Veamos si ello es permisible.

## X

Aun cuando en Puerto Rico no se ha discutido la facultad que pueda tener el Gobernador para congelar fondos, en Estados Unidos se ha cuestionado el poder que tiene, o pudiese tener, el Presidente para restringir el uso de fon-

---

"Sr. GONZALEZ BLANES: La situación es eliminar de la línea 3, página 3, las palabras 'cumplir y', de modo que la obligación del Gobernador sea hacer cumplir las leyes, *porque es innecesario poner aquí que el Gobernador va a cumplir las leyes de Puerto Rico como cualquier otro ciudadano, si el Gobernador de Puerto Rico está obligado a cumplir las leyes ... que es el deber y la obligación verdaderos.*

"DELGADOS: Que se vote.

"... APROBADA." 3 Diario de Sesiones de la Convención Constituyente 1758 (1952).

Al volver sobre la misma disposición se expresó:

"Sr. FONT SALDAÑA: ... 'hacer cumplir las leyes', tiene una connotación de tercera persona y al mismo tiempo conlleva, inclusive, una sanción punitiva si no se cumple, 'destitución'; y cualquier otra forma de conminar a un ciudadano o funcionario público a que cumpla las leyes.

"Esa connotación que tiene la expresión 'hacer cumplir las leyes', no alcanza, propiamente dicho, al que ha de hacerlas cumplir por sentido íntimo de la naturaleza humana de que a nadie a sí mismo se impone sanciones punitivas cuando comete una falta, a no ser en casos excepcionales de personas consagradas a ejercicios religiosos especialmente. Pero, la experiencia demuestra que, en el caso de funcionarios públicos, lo más corriente es que encuentran más que en eso, excusas, y además yo he visto en muchísimas constituciones estatales, la disposición expresa de que el ejecutivo, entre sus deberes y obligaciones, tiene el de cumplir fielmente las leyes.

"Como pudiera haber duda, confusión en cuanto a si el término 'hacer cumplir las leyes' incluye o no lo incluye al Gobernador, o al funcionario ejecutivo que sea, razonando de que sí lo incluye, porque es un ciudadano, yo creo que la controversia que pudiera haber sobre el asunto se disipa totalmente con la enmienda que propongo: 'ser responsable de la fiel ejecución de las leyes', que lo alcance a él sin lugar a dudas en este caso, sin que haya razón ni motivo para dudar del alcance de la disposición." Diario de Sesiones, ante, págs. 1789–1790.

*Planteado el asunto nuevamente mediante reconsideración ante la Convención Constituyente se preservó el lenguaje original sobre el deber ministerial del Ejecutivo de hacer cumplir las leyes:*

"Sr. SOTO: Para proponer que se enmiende la línea tercera en el sentido de incluir nuevamente la palabra 'cumplir'; de suerte que lea, 'cumplir y hacer cumplir las leyes'. 'Cumplir y hacer cumplir las leyes', esa era la forma original.

"... APROBADA. Diario de Sesiones, ante, págs. 1871–1872.

dos públicos, designados expresamente por el Congreso y convertidos en ley mediante la firma de éste. Varios *tratadistas* han expresado que el Presidente tiene un poder inherente para congelar fondos basado en la Sec. 3 del Art. II de la Constitución de Estados Unidos que establece que el Presidente: "shall take care that the laws be faithfully executed." Tribe, *op. cit.*, pág. 256.[57] Esta posición *no* ha sido adoptada por el Tribunal Supremo federal. *Kendall v. United States*, 37 U.S. 522 (1938); Tribe, *op. cit.*, pág. 258.

En *Kendall v. United States*, ante, pág. 611, el Tribunal Supremo resolvió que cuando el Congreso ha designado expresamente una suma de dinero para ser gastado, el Presidente no tiene poder constitucional para no hacer el gasto.

> To contend, that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible.[58]

No obstante la clara norma pautada en el citado caso de *Kendall v. United States*, a los efectos de que el Presidente no tiene poder inherente para congelar fondos, durante la década de 1970 el Presidente Nixon detuvo el gasto de fondos públicos asignados a varios programas de asistencia social, dando base a numerosos pleitos. Véanse: *Train v. City of New York*, 420 U.S. 35 (1975); *National Coun. of*

---

[57] Véanse: Mills and Munselle, *Unimpoundment; Politics and the Courts in the Release of Impoundment Fonds*, 24 Emory L.J. 313 (1975); Nota, *Impoundment of Funds*, 86 (Núm. 8) Harv. L. Rev. 1505 (1973); H. Boggs, *Executive Impoundment of Congressionally Appropriated Funds*, 24 (Núm. 2) U. Fla. L. Rev. 221, 224 (1974); F. Church, *Impoundment of Appropriated Funds: The Decline of Congressional Control over Executive Discretion*, 22 Stan. L. Rev. 1240, 1242 (1970); Nota, *Presidential Impoundment: Constitutional Theories and Political Realities*, 61 Geo. L.J. 1295 (1973).

[58] En 1969, el actual Presidente del Tribunal Supremo, Juez Rehnquist, en su capacidad de *Assistance Attorney General* declaró que:
"... It may be agreed that the spending of money is inherently an executive function, and it seems an anomalous proposition that because the executive branch is bound to execute the laws, it is free to decline to execute them." Tribe, *op. cit.*, pág. 258.

454

*Com. Mental H. Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897 (1973); *State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099 (8vo Cir. 1973); *Housing Auth., San Francisco v. H.U.D.*, 340 F. Supp. 654 (1972); *San Francisco Redevelopment Agency v. Nixon*, 329 F. Supp. 672 (1971). En todos estos casos, los tribunales de instancia evitaron entrar en el aspecto constitucional sobre el poder inherente del Presidente de congelar fondos y los mismos fueron resueltos por interpretación estatutaria de las leyes envueltas. Las controversias giraron en torno a si la legislación en cuestión autorizaba al Presidente a congelar dichos fondos.

Como consecuencia de estos litigios, en 1974 el Congreso de Estados Unidos aprobó el *Impoundment Control Act*, 2 U.S.C. secs. 681–688, el cual establece el procedimiento de congelación de fondos por parte del Gobierno federal.[59] Como vemos, el poder de congelar fondos en el Gobierno federal se ha dilucidado sobre bases estatutarias —no constitucionales— ya sea por las leyes especiales antes discutidas o porque la misma ley que permite el gasto expresamente lo autorice.

En Puerto Rico, al igual que en Estados Unidos, *no* se le reconoce al Primer Ejecutivo un poder constitucional para congelar fondos designados expresamente por ley;[60] *no* existe tampoco base estatutaria que autorice tal proceder. Reconocer que el Ejecutivo tiene facultad para congelar los fondos expresamente asignados por ley, equi-

---

[59] Esta ley crea dos procedimientos distintos para la congelación de fondos: el primero de estos es el de los "diferimientos", el cual congela los fondos hasta un máximo de un año, desde que se notificó esta decisión al Congreso; el segundo es el de "rescisiones", el cual prevalece más allá del año fiscal envuelto. Ambos mecanismos tienen un procedimiento de aprobación o desaprobación por parte del Congreso.

Otras leyes que permiten la congelación de fondos por parte del Presidente son: *Anti-Deficiency Act* de 1950, según enmendada en 1974, (31 U.S.C. sec. 665); *Employment Act* de 1946 (15 U.S.C. sec. 1021); *Economic Stabilization Act* de 1970 (12 U.S.C. sec. 1904).

[60] Ni de la Constitución del Estado Libre Asociado ni del Diario de Sesiones de la Convención Constituyente se infiere que el Gobernador tenga esta facultad.

valdría a reconocerle al Gobernador un poder de revocar la vigencia de una ley válidamente aprobada por la Asamblea Legislativa y a la que éste impartió su firma creando con ello un poder de "super veto" que la Asamblea Constituyente nunca contempló. No cabe la menor duda que el *poder absoluto* para congelar fondos asignados por ley es ciertamente una incursión severa en el poder de hacer las leyes.([61]) Nota, *Impoundment of Funds*, 86 (Núm. 8) Harv. L. Rev. 1505 (1973). Ante esta realidad, todo parece indicar que el *mandamus* es un recurso apropiado para exigirle al Gobernador, como parte de sus deberes ministeriales, que ponga en ejecución el desembolso de dinero aprobado por las referidas Resoluciones Conjuntas, ya que el Primer Ejecutivo no tiene la facultad discrecional de congelar los mismos.

Ahora bien, el Gobernador alega que no procede la ejecución del *mandamus* porque las referidas Resoluciones Conjuntas son inconstitucionales.([62]) Teniendo claro que el propósito esencial del auto de *mandamus* es obligar a la obediencia ministerial de una ley *válida*, cualquier intento de poner en vigor una ley que alegadamente contraviene la Constitución de Puerto Rico constituye una violación del mandato constitucional de actuar legalmente y conforme a derecho, deber impuesto por esta misma Constitución. En caso de que las referidas Resoluciones

---

([61]) A esos efectos, en *Youngstown Co. v. Sawyer*, 343 U.S. 579, 587–588 (1952), se expresó:

"*In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.* The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. *And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.* The first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States ....' "(Énfasis suplido.)

([62]) No podemos pasar por alto la conducta contradictoria del entonces Gobernador Hernández Colón, esto es, firmar una ley que a su entender era inconstitucional. Esta actuación es a todas luces inconsistente con su deber constitucional de desaprobar aquellas leyes aprobadas por la Legislatura que a su entender sean contrarias a la Constitución. Véase Art. IV, Sec. 4, Const. E.L.A., L.P.R.A., Tomo 1.

Conjuntas fueran aprobadas bajo un esquema violatorio de nuestra Constitución, este Tribunal debe —en cumplimiento de su deber— declarar judicialmente inconstitucional dichas leyes y ordenar al Gobernador abstenerse de poner en vigor las mismas. Véase Ferris, *The Laws of Extraordinary Legal Remedies*, Missouri, Thomas Law Book Co., 1926, pág. 235. El recurso de *mandamus*, en otras palabras, no procede para compeler la ejecución de actos ilegales, contrarios a la política pública o tendentes a auxiliar un propósito ilegal. *Griffith v. Junta de Retiro*, 53 D.P.R. 480 (1938). En vista de lo expresado, *debemos examinar la validez de las referidas resoluciones, en ánimo de evitar el ordenar la ejecución de una ley que pudiera ser inconstitucional.*

## XI

La alegada inconstitucionalidad de las Resoluciones Conjuntas, aprobando el "barril de tocino", *radica en la supuesta violación del principio de separación de poderes, impregnado en nuestro sistema republicano de gobierno.* Véase Art. I, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1. El Gobernador alega que la forma en que se distribuyen los fondos asignados por estas resoluciones va en detrimento de su facultad ejecutiva de poner en vigor las leyes y que éstas no proveen suficientes garantías fiscales para el uso de los fondos públicos, contraviniendo así la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 369, la cual establece que:

Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado; y en todo caso por autoridad de ley.

El "barril de tocino" es una asignación legislativa que se aprueba anualmente, en la medida en que los recursos fiscales lo permitan, y en la cual la Asamblea Legisla-

tiva asigna fondos estatales para realizar obras y proyectos en diferentes municipios.([63]) La práctica legislativa que da base a la distribución de fondos a través del "barril de tocino" consiste en que anualmente se separa una cantidad de dinero para los miembros de la Cámara de Representantes y del Senado de Puerto Rico para que éstos lo distribuyan en sus respectivos distritos representativos en obras permanentes y no permanentes. Esta práctica tiene su origen en el sistema congresional norteamericano donde existía un apoyo recíproco entre los congresistas para asignar fondos públicos para distintas obras en sus respectivos estados.([64])

En Puerto Rico, el concepto de "barril de tocino" se conoce en la esfera legislativa desde hace varias décadas. En la Asamblea Constituyente se discutió los peligros que suponía esta práctica, por lo que se ofreció un remedio recogido en el veto de partida o línea que le fue encomendado al Gobernador en el Art. III, Sec. 20 de nuestra Constitución, ante.([65])

---

([63]) En su origen, los fondos del "barril de tocino" se asignaban para obras auspiciadas por la Cámara de Representantes; en años recientes, también se reserva una partida para los proyectos auspiciados por el Senado. Véase Op. Sec. Just. Núm. 1989-25.

([64]) La jerga política denominaba como *pork barrel* la práctica de separar fondos provenientes del tesoro gubernamental para obras estatales. Se entendía que esto era una reminiscencia de las grandes plantaciones del Sur de Estados Unidos de separar una porción del cerdo para que fuera distribuida entre los esclavos. Las porciones del cerdo se salaban y cocinaban en barriles para ser distribuidos de tiempo en tiempo entre los esclavos. Hoy en día esta práctica se visualiza como un premio por los servicios al partido político a través de un diseño legislativo. J. Truslow Adams, *Dictionary of American History*, Nueva York, Charles Scribner's Sons, Vol. 14, 1940, pág. 314. Véanse, además: M. Galston, *Lobbying and the Public Interest: Rethinking the Internal Revenue Code's Treatment of Legislative Activities*, 71 (Núm. 6) Tex. L. Rev. 1269 (1993); Posby, *Restoration Comedy*, 102 Yale L.J. 1515 (1993); M.B. Rappaport, *The President's Veto and The Constitution*, 87 (Núm. 3) Nw. U. L. Rev. 735 (1993); G.A. Tarr, *Understanding State Constitutions*, 65 (Núm. 4) Temp. L. Rev. 1169 (1992); J. Sidah y T.A. Smith, *Four Faces of the Item Veto: A Reply to Tribe and Kurland*, 84 (Núm. 2) Nw. U. L. Rev. 437 (1990).

([65]) Esta disposición constitucional establece:

"Al aprobar cualquier proyecto de ley que asigne fondos en más de una partida, el Gobernador podrá eliminar una o más partidas o disminuir las mismas reduciendo al mismo tiempo los totales correspondientes." Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 346.

El mecanismo del "barril de tocino", *que hoy examinamos*, operaba de la siguiente forma: la Cámara de Representantes o el Senado aprobaban una partida de dinero a ser designada a cada representante de distrito, sea representativo o senatorial. Estos fondos eran transferidos a la antes A.S.M., hoy en día, a la Oficina del Comisionado de Asuntos Municipales, entidad a la cual el legislador sometía una descripción de los proyectos a los cuales el administrador debía enviar los fondos. Las descripciones de los proyectos a ser beneficiados por tales recursos se hacían con *completa discreción* del legislador que distribuía los fondos *sin que existiera* fiscalización alguna por un organismo gubernamental, ya que la A.S.M. era tan sólo un *distribuidor* de los mismos. *Es sobre este esquema que se basa la alegada violación del principio de separación de poderes.*

■ El Pueblo de Puerto Rico tiene una forma republicana de gobierno, donde los Poderes Legislativo, Ejecutivo y Judicial están subordinados a la soberanía del Pueblo. Art. I, Sec. 2, Const. E.L.A., ante. La Rama Ejecutiva tiene como función esencial la de hacer cumplir las leyes, a diferencia de la Rama Judicial, cuya función primordial es la de interpretar las mismas. En este sentido la función de estas dos Ramas está supeditada a la función principal de la Rama Legislativa de hacer o aprobar las leyes. Véanse: Arts. III, IV y V, Const. E.L.A., ante; *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66 (1944).

Al distribuir los poderes entre tres ramas iguales e independientes, la Constitución evitó la concentración del

---

Como parte de los comentarios a esta disposición se expresó:

"La disposición sobre el veto de partidas, corresponde también a la que hoy rige en la Ley Jones. Razones de peso señalan hacia la deseabilidad de mantener esa facultad ejecutiva. *Hace posible la integración de un programa económico, permitiendo al Gobernador eliminar las partidas innecesarias. Sirve para que el Gobernador pueda desalentar la práctica de concesiones mutuas (log rolling) entre los legisladores.* Complementa el poder general de veto, permitiendo se eliminen partidas asignadas para propósitos que no recibieron la aprobación ejecutiva." (Énfasis suplido y en el original.) Diario de Sesiones, ante, Vol. 4, pág. 2586.

poder en una de ellas, y garantizó la libertad individual y colectiva de los ciudadanos. Nuestra Constitución también contiene un complejo sistema de pesos y contrapesos que asegura una interacción entre los tres componentes del sistema de gobierno y que genera un equilibrio dinámico que evita que una de las ramas amplíe su autoridad debilitando a las otras. *Hernández Agosto v. Romero Barceló,* ante, págs. 427–428; *Hernández Agosto v. López Nieves,* 114 D.P.R. 601, 612–622 (1983); *Mistretta v. United States,* 488 U.S. 361 (1989); *Morrison v. Olson,* 487 U.S. 654 (1988). Sin embargo, la teoría de separación de poderes nunca se concibió como una estructura de carácter estático en que cada poder funcionaría en "un vacío, completamente independiente y alejada de las otras. Más bien lo que la Constitución protegía fué descrito como sigue: 'La acumulación de *todos* los poderes, legislativo, ejecutivo y judicial, en las *mismas* manos ...' ". (Énfasis en el original.) *Banco Popular, Liquidador v. Corte,* ante, págs. 71–72.

Como expresamos en *Nogueras v. Hernández Colón,* 127 D.P.R. 405, 426–427 (1990):

> Al adjudicar controversias que requieren un pronunciamiento sobre la aplicabilidad de esta doctrina, nos corresponde dilucidar la cuestión en términos de si en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución. Véase Tribe, *American Constitutional Law, op. cit.,* págs. 213–218. En controversias de este tipo debemos distinguir entre "facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas" (*In re Rodríguez Torres,* 106 D.P.R. 698, 709 (1978)), y a la luz de las circunstancias históricas prevalecientes, delimitar los contornos de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema.[66]

---

[66] En *Banco Popular, Liquidador v. Corte,* 63 D.P.R. 66, 74 (1944), este Tribunal expresó que los factores a ser considerados en la violación de esta doctrina por parte de una rama de gobierno son: (1) determinar primeramente si la función espe-

En el caso de autos, la alegada violación al principio de separación de poderes se basa primordialmente en que la Rama Legislativa, o algunos de sus miembros en su carácter oficial, están abrogándose a sí funciones o prerrogativas de la Rama Ejecutiva, a saber, *poner en vigor las leyes*.

Las Secs. 1 y 4 del Art. IV de nuestra Constitución, ante, establecen que el Poder Ejecutivo se ejerce por el Gobernador y asigna a éste, entre otros deberes, funciones y atribuciones: el cumplir y hacer cumplir las leyes y nombrar según se disponga por esta Constitución o por ley, a todos los funcionarios que ayudarán en el descargo de esta función. Aun cuando en Puerto Rico no es abundante la jurisprudencia, sobre alegadas situaciones donde la Asamblea Legislativa ha usurpado poderes ejecutivos, en la esfera federal se ha discutido dicha situación. Examinamos, con propósito ilustrativo, decisiones del Tribunal Supremo de los EE. UU. al respecto. Ejemplo de ello lo es el caso de *Springer v. Philippine Islands*, 277 U.S. 189 (1928). Allí se planteó ante el Tribunal Supremo federal la facultad que tenía la Legislatura de Filipinas para transferir a una junta de directores el poder de voto sobre unas acciones bancarias, poder antes ejecutado por el Gobernador. Esta junta de directores estaría compuesta por el Gobernador y por los Presidentes de ambas Cámaras Legislativas. El Tribunal Supremo resolvió que el poder de voto en dichas acciones era una función ejecutiva y que la composición de la junta de directores menoscababa el poder del Gobernador de nombrar a los miembros de dicha junta. Expresó, además:

> *Legislative power, as distinguished from executive power, is the authority to make laws, but not to enforce them or appoint the agents charged with the duty of such enforcement. The latter are executive functions. It is unnecessary to enlarge further upon*

cífica de que se trate, ha sido asignada expresamente por la Constitución a la Rama Gubernamental que trata de ejercitarla, o (2) si la ejecución de dicha función por tal Rama, es un incidente necesario para el ejercicio de otras funciones que le son expresamente conferidas por la Constitución.

*the general subject, since it has so recently received the full consideration of this Court. Myers* v. *United States*, 272 U.S. 52.

Not having the power of appointment, unless expressly granted or incidental to its powers, the legislature cannot engraft executive duties upon a legislative office, since that would be to usurp the power of appointment by indirection; though the case might be different if the additional duties were devolved upon an appointee of the executive. (Traducción y énfasis nuestros.) *Springer v. Philippine Islands*, ante, pág. 202.

En 1976, el Tribunal Supremo de Estados Unidos, reafirmando la decisión de *Springer v. Philippine Islands*, ante, expresó, en *Buckley v. Valeo*, 424 U.S. 1 (1976),([67]) que corresponde al Presidente la facultad de nombrar los funcionarios que ponen en ejecución o administran las leyes. En dicho caso el Tribunal, citando a *Myers v. United States*, 272 U.S. 52 (1926), expresó:

*"The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws.* He must execute them by the assistance of subordinates .... As he is charged specifically to take care that they be faithfully executed, the reasonable implication, even in the absence of express words, was that as part of his executive power he should select those who were to act for him under his direction in the execution of the laws." (Énfasis suplido.) *Buckley v. Valeo*, ante, págs. 135–136.

Más recientemente, en *Bowsher v. Synar*, 478 U.S. 714 (1986), el Tribunal Supremo federal invalidó aquella parte del *Balanced Budget and Emergency Deficit Control Act* de 1985,([68]) que le confería poder al Contralor General de Estados Unidos de intervenir en la reducción del déficit nacional, función reservada al Poder Ejecutivo. El Tribunal

---

([67]) En *Buckley v. Valeo*, 424 U.S. 1 (1976), el Tribunal Supremo invalidó la composición y el método de nombramiento de los miembros de la Comisión Federal de Elecciones, en la que participaban el Presidente de Estados Unidos y los Presidentes de la Cámara y el Senado federal. El Tribunal entendió que las funciones llevadas a cabo por esta Comisión eran de carácter ejecutivo y, por lo tanto, la designación de sus miembros correspondía al Poder Ejecutivo.

([68]) Esta ley se conoce como la Ley Gramm–Rudman–Hollings, 2 U.S.C. sec. 901 *et seq.*

Supremo entendió que el Contralor, a pesar de ser un funcionario nombrado por el Presidente y confirmado por el Senado, era un funcionario de la Rama Legislativa dado que su destitución y control estaba sujeto al Congreso.([69]) *El Tribunal expresó que la Constitución impide al Congreso hacer cumplir las leyes, ya que esto es una tarea reservada a la Rama Ejecutiva y que asignarle funciones ejecutivas a un funcionario sujeto a la autoridad del Congreso, redundaba en asumir el control sobre el proceso de poner en vigor las leyes.* El Tribunal Supremo, citando a *INS v. Chadha*, ante, concluyó, además, que reconocerle esta facultad ejecutiva a un funcionario del Congreso significaba reconocerle un poder de veto al Congreso, pues a éste le correspondería interpretar la ley para ponerla en vigor, además de determinar las reducciones que debían efectuarse.([70])

Por su parte, en Puerto Rico, en *Tugwell, Gobernador v.*

---

([69]) A esos efectos, expresó:

"Congress of course initially determined the content of the Balanced Budget and Emergency Deficit Control Act; and undoubtedly the content of the Act determines the nature of the executive duty. However ... once Congress makes its choice in enacting legislation, its participation ends. Congress can thereafter control the execution of its enactment only indirectly-by passing new legislation. ... By placing the responsibility for execution of the Balanced Budget and Emergency Deficit Control Act in the hands of an officer [the Comptroller General] who is subject to removal only by itself, Congress in effect has retained control over the execution of the Act and has intruded into the executive function. The Constitution does not permit such intrusion." *Bowsher v. Synar*, 478 U.S. 714, 733–734 (1986).

([70]) Recientemente en *Wash. Airports v. Noise Abatement Citizens*, 501 U.S. 252 (1991), el Tribunal Supremo federal volvió a enfrentarse a una actuación congresional que violentaba el principio de separación de poderes. En dicho caso el Congreso federal autorizó la transferencia del control operacional de dos aeropuertos en el área de Washington, del Gobierno federal (Departamento de Transportación) a una entidad conocida como *Metropolitan Washington Airports Authority* (M.W.A.A.). Esta agencia fue creada por un convenio entre el estado de Virginia y el Distrito de Columbia para administrar los aeropuertos: Washington National Airport (National) y el Dulles International Airport (Dulles). La autorización congresional estaba sujeta a la creación de una Junta de Directores la cual estaría compuesta por nueve Congresistas —de los cuales ocho servían en comités relacionados con problemas de transportación— los cuales tendrían poder de veto, entre otros, sobre el presupuesto, emisión de bonos, reglamentaciones y selección de ejecutivos. Dicha legislación establecía que estos Congresistas servirían en su "capacidad individual" —no como miembros del Congreso— y en representación de los usuarios de los aeropuertos. El Tribunal Supremo federal entendió que dicha cláusula violaba el principio de separación de poderes existente en el Gobierno de Estados Unidos, al asignarle funciones ejecutivas —como lo son el manejo y control de las operaciones de estos aeropuertos— a manos legislativas.

*Corte*, 64 D.P.R. 220 (1944), este Tribunal, al analizar el Art. 7 de la Ley Núm. 33 de 1932, según enmendada, la cual establecía que los Presidentes de la Cámara de Representantes y del Senado de Puerto Rico serían miembros del comité que aprobaba los desembolsos del Fondo Insular de Emergencia,([71]) determinó que dicha disposición violaba el esquema de separación de poderes y constituía una invasión inconstitucional de la Legislatura en las funciones correspondientes al Poder Ejecutivo. Dicho dictamen se basó en *Springer v. Philippine Islands*, ante.

De la jurisprudencia antes citada se desprende que el *factor determinante* al analizar si el poder legislativo ha usurpado la función ejecutiva de poner en vigor las leyes, violando así el principo de separación de poderes, lo es determinar si ésta —Rama Legislativa— tiene el *control o última autoridad* sobre la ejecución de la ley. *Bowsher v. Syner*, ante; *Lear Siegler, Inc., Energy Products Div. v. Lehman*, 842 F.2d 1102 (9no Cir. 1988). A esos efectos, en *Bowsher v. Synar*, ante, se expresó que la esencia del concepto de poner en vigor la ley *(execution of the law) no* es la mera interpretación e implementación del mandato legislativo, *sino es determinar quién ejerce la última autoridad sobre los oficiales que implementan la ley.* Si el poder legislativo en efecto retiene el control sobre la ejecución de una ley, su acción así como el estatuto que lo autoriza es inconstitucional. *Bowsher v. Synar*, ante, pág. 3192. A esos efectos se expresó:

To permit an officer controlled by Congress to execute the laws

---

Señaló además que el Congreso no puede investirse a sí mismo, ni a sus miembros de poderes ejecutivos, ni judiciales; no pudiendo, por ende, poner en vigor las leyes.

([71]) Este comité estaba compuesto *además* por el Gobernador, el Tesorero y por el Auditor de Puerto Rico. Este cuerpo tenía la función ejecutiva de *aprobar* el desembolso de fondos, los cuales eran remanentes del presupuesto, para "afrontar necesidades públicas inesperadas e imprevistas causadas por calamidades, tales como guerras, huracanes ...". Art. 4 de la Ley Núm. 33 de 1930, según enmendada por la Ley Núm. 3 de 1942.

would be, in essence, to permit a congressional ... *control* over the execution of the laws .... (Énfasis suplido.)

*Claramente la facultad de poner en vigor las leyes es una exclusiva del Poder Ejecutivo y la misma sólo puede ser ejercitada por funcionarios adscritos a dicho poder. Véase Sec. 4, Art. IV de la Constitución de Puerto Rico, ante. Evidentemente los legisladores no son parte del Poder Ejecutivo y la participación de éstos, como funcionarios de la Rama Ejecutiva, constituye una intromisión que afecta la separación de poderes que debe existir entre las ramas del Gobierno.*

Al examinar el esquema de distribución de fondos públicos de las Resoluciones Conjuntas ante nos, es de resaltar que luego de aprobada la resolución, el A.S.M. recibirá o deberá recibir por parte del legislador una "relación de las obras y mejoras que le interesa que se lleven a cabo en su distrito". Dicho funcionario viene *obligado* a asignar los *fondos según lo solicite el legislador.* Ante este hecho, se observa que la función de un organismo ejecutivo, la A.S.M., *está subordinada a la potestad del legislador de decidir cómo se habrá de cumplir la ley.* Bajo este esquema, el Administrador le confiere al legislador el poder de tomar una acción de naturaleza ejecutiva: el decidir las obras públicas que habrán de llevarse a cabo. *Con estas prerrogativas, los legisladores asumen la función ejecutiva de hacer cumplir, poner en vigor y administrar las leyes.*

No puede enfatizarse suficientemente el hecho de que las Resoluciones Conjuntas referentes al "barril de tocino", según aprobadas y firmadas por la Legislatura y el Primer Ejecutivo, respectivamente, le conceden a cada legislador de distrito la *autoridad última* para disponer de los fondos asignados por las referidas resoluciones. Éstas dejan al juicio individual de un legislador la decisión de en qué se utilizarán los fondos públicos consignados en una agencia de poder ejecutivo y dejan al arbitrio y capricho de este legislador la función de que se cumplan los fines de una

resolución que tiene fuerza de ley, dependiendo de lo que de forma aislada y unilateral pueda desear éste.([72])

No cabe la menor duda de que las referidas Resoluciones Conjuntas dependen para su implantación, ejecución y cumplimiento —funciones éstas reservadas al Poder Ejecutivo— de la voluntad particular de varios legisladores, quienes determinarán el destino, tiempo, cantidad y manera en que los fondos habrán de ser distribuidos.([73]) Evidentemente el control sobre la ejecución de estas resoluciones descansa, en última instancia, en la voluntad particular de cada legislador; éstos como representantes del Cuerpo Legislativo disponen de los fondos asignados para realizar aquellas obras que a su entender sean necesarias en sus respectivos distritos. Estos legisladores, como miembros del Poder Legislativo, no están subordinados a la voluntad del Poder Ejecutivo, por lo que *no* son parte de la política pública implementada por el Gobernador. *Claramente la función de disponer de los fondos públicos es una de naturaleza ejecutiva y resulta evidentemente dañina, la práctica de poner en manos legislativas la función de hacer cumplir las leyes, ya que puede constituir un "veto legislativo" sobre una ley firmada por el Gobernador.* Véanse: *Bowsher v. Synar*, ante; *INS v. Chadha*, ante. Ello trastoca

---

([72]) Somos del criterio de que el hecho de que la actuación del legislador esté autorizada y constituya una delegación expresa de poderes por parte de la Legislatura y el Primer Ejecutivo mediante la aprobación de una ley, esto no subsana el defecto constitucional de que la misma viola el principio de separación de poderes que garantiza que únicamente es el Poder Ejecutivo el llamado a poner en vigor la ley. *CR: Bowsher v. Synar*, ante.

([73]) Ante esta situación, no podemos pasar por alto lo expresado por el Hon. Secretario en su opinión, donde alega:

"La situación es *sui géneris* ya que el Administrador depende de llamadas telefónicas o cartas para decidir cómo se gasta el dinero y se lleva cuenta de los desembolsos efectuados a través de unas cuentas individuales a nombre de cada legislador, lo cual dificulta la fiscalización y el control adecuado del destino de los fondos. Ello puede propiciar el desvío de los fondos hacia actividades en que el propio legislador, en su capacidad personal, tenga intereses muy particulares que desee adelantar y que resulten muy difíciles de identificar a base del procedimiento que se ha establecido." LX Opiniones del Secretario de Justicia 25 (1989).

la doctrina de separación de poderes al concederle una facultad excesiva a la Asamblea Legislativa.

 Resulta, pues, concluyente, que las Resoluciones Conjuntas Núms. 94 y 111 de la Cámara de Representantes y el Senado, aprobadas el 17 de agosto de 1981, asignando fondos de "barril de tocino", *se aprobaron al amparo de un esquema legislativo que violenta la separación de poderes existente en nuestro sistema de gobierno.* La utilización de los fondos públicos, en ausencia de una especificación clara en la propia resolución conjunta, constituye una función ejecutiva que estaría delegada indebidamente y asumida por un funcionario de la Rama Legislativa. *En vista de ello, procede declarar inconstitucional tal práctica legislativa, esto es, la de aprobar resoluciones de "barril de tocino" que dependan para su ejecución de la exclusiva voluntad legislativa*; razón por la cual no procede el recurso de *mandamus* radicado por los demandantes apelantes.[74]

## XII

Procede, por último, analizar la alegación del Procurador General a los efectos de que el Tribunal Superior no podía establecer "los requisitos que debe seguir toda Resolución Conjunta asignando fondos". El juez de instancia, como parte dispositiva del caso, expresó en su sentencia:

(5) En cumplimiento a nuestra misión judicial, resolvemos que cualquier resolución conjunta que asigne fondos públicos para la realización de obras permanentes o no permanentes deberá contener información específica suficiente que permita al ejecutivo ejercitar, a sabiendas y no a ciegas, su prerrogativa de aceptar o rechazar cualquier legislación, fuere en su totalidad, o en cuanto a alguna partida. Esta información específica ayudará a que en la implantación, el funcionario a cargo, en este caso el Administrador de Servicios Municipales, pueda su-

---

[74] A la luz de lo antes resuelto, es improcedente discutir la alegación de que las referidas Resoluciones Conjuntas violan la Sec. 9 del Art. VI de nuestra Constitución, L.P.R.A., Tomo 1, referente al uso de fondos públicos.

pervisar adecuadamente y dar seguimiento a los desembolsos, autorizados, asegurándose que se cumple la intención legislativa según avalada por el ejecutivo.

En ausencia de reglamentación sobre la materia y en armonía con la disposición constitucional consagrada en la Sección 9, Artículo VI, sobre uso de fondos públicos para fines públicos resolvemos que:

(a) La resolución o partida asignando fondos para realizar obras contendrá una descripción de la obra; adquisición o servicio; una estimación del costo total proyectado; el lugar en el que se estima servirá; el tiempo que se calcula tomará realizarla; y la entidad gubernamental que tendrá directamente a su cargo la realización o la supervisión de la obra.

(b) En cuanto a controles fiscales la resolución deberá contener o en su defecto el Administrador de Servicios Municipales deberá asegurarse de que se confeccione un sistema de pagos escalonados a base de desembolsos según se vaya certificando el estado de progreso de la obra o prestación del servicio; un sistema de cotejo para verificar que se han realizado las subastas o cotizaciones necesarias de conformidad con la ley; un sistema de recibo y registro de documentos, facturas y comprobantes para cada partida; y un archivo de fácil acceso para el público donde pueda verificarse toda la documentación relacionada con la realización de obras, compras, prestación del servicio bajo este esquema.

Somos del criterio que el tribunal de instancia, en el caso de autos, al establecer unas pautas sobre cómo se deben redactar las Resoluciones Conjuntas referente al "barril de tocino", *usurpó poderes y prerrogativas constitucionales de las otras dos Ramas del Gobierno*, ya que son estas Ramas las llamadas a participar en la redacción y aprobación de las leyes.[75]

Constituye norma reiterada, y ampliamente reconocida, que bajo nuestro sistema de gobierno los tribunales deben mantenerse dentro del ámbito de la función

---

[75] Puede darse el caso en que sea la Rama Judicial la llamada a juzgar, diseñar e implantar el remedio que ha de concederse, logrando así el propósito fundamental de una determinación judicial; ello en vista de que sea el propio Estado, el cual violentando los derechos constitucionales fundamentales de todos o parte de los ciudadanos, no provea un remedio adecuado que resulte apropiado para proteger o restaurar los derechos de los afectados. Véase *Noriega v. Gobernador*, 122 D.P.R. 650 (1988).

judicial, estándole vedado incursionar en la esfera legislativa. *Caguas Bus Line v. Sierra, Comisionado*, 73 D.P.R. 743 (1952). La función de la Rama Judicial es la de resolver casos y controversias conforme a derecho, interpretando así las leyes que apruebe la Asamblea Legislativa. Al resolver una controversia, el juez debe abstenerse de sustituir el criterio legislativo por su propio concepto de lo que es justo, razonable, y deseable.[76] A esos efectos, en *The Texas Company. v. Domenech, Tes.*, 50 D.P.R. 432, 451 (1936), expresamos que:

> No es función de este tribunal corregir las deficiencias que encuentre en la legislación sometida a su estudio e interpretación. Lo único que podemos hacer es señalar esas deficiencias, para que ellas sean corregidas por el Poder Legislativo.

En vista de ello, nos preocupa sobremanera que el remedio concedido por el Tribunal Superior tenga el efecto de indicarle a la Legislatura cómo debe aprobar sus resoluciones referentes al "barril de tocino" para que éstas sean constitucionalmente válidas; tal remedio claramente puede ser considerado una opinión consultiva. Véanse: *E.L.A. v. Aguayo*, ante; *Flast v. Cohen*, ante. Entendemos la preocupación del magistrado de instancia en cuanto a la ausencia de parámetros en las Resoluciones Conjuntas aquí impugnadas, compartimos su preocupación; mas no por ello debe la Rama Judicial incursionar en tareas que le competen a las otras ramas de gobierno. Dichos "remedios accesorios" son, obviamente, improcedentes en derecho.

## XIII

A tenor con todo lo antes expuesto, *procede confirmar la sentencia del Tribunal Superior que declara inconstitucio-*

---

[76] R.E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed., San Juan, Pubs. J.T.S., 1981, pág. 299.

*nal la práctica legislativa de asignar fondos al "barril de tocino", según descrita en el caso de epígrafe.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad. El Juez Asociado Señor Negrón García emitió una opinión concurrente.

$$- \text{O} -$$

Opinión concurrente del Juez Asociado Señor Negrón García.

I

Suscribimos el dictamen mayoritario que confirma el decreto de inconstitucionalidad del Tribunal Superior, Sala de San Juan (Hon. Arnaldo López Rodríguez, Juez), sobre las resoluciones conjuntas que confieren a la Rama Legislativa, a través de sus senadores y representantes por distrito, la facultad de decidir cómo disponer los fondos asignádoles provenientes del denominado "barril de tocino".

Evidentemente esas resoluciones infringen el esquema de separación de poderes en que se apuntala nuestro régimen constitucional. Sólo requieren al legislador por distrito someter al Administrador de Servicios Municipales —hoy día, Oficina del Comisionado de Asuntos Municipales— una relación de las obras y mejoras permanentes, así como de otras obras, adquisición de equipo, compra de materiales y otras actividades de interés social, dándoles el poder absoluto de disponer así de los fondos. El resultado final es conferirle a la Asamblea Legislativa la facultad de ejecutar leyes, atributo exclusivo del Primer Ejecutivo.

La carencia de especificidad sobre el destino de los fondos que comprenden el "barril de tocino" tiene el potencial y genera el peligro de desvío en sus desembolsos. Ello difi-

culta, a su vez, la fiscalización necesaria para preservar la pureza del sistema democrático.

## II

No podemos, sin embargo, avalar los pronunciamientos en torno al ámbito y alcance de la legitimación de legisladores (Parte IV), fundados en las injustas decisiones de *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992), y *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992), respectivamente.

Como expresáramos en la primera decisión, esa norma anquilosa el proceso evolutivo liberal que reconoce el derecho de los legisladores "a reivindicar las prerrogativas de sus cargos". Reiteramos una vez más lo erróneo de sostener que el derecho de fiscalización de las minorías halla su epílogo "con la sola participación en 'el debate y proceso legislativo', esto es, con votar a favor o en contra de una ley". Como señaláramos, contrario a la corriente doctrinaria prevaleciente en el ámbito federal, nuestra Constitución reconoce *expresamente* a las minorías legislativas el papel de fiscalizadores, *aun bajo las circunstancias más desfavorables*. 4 Diario de Sesiones de la Convención Constituyente 2590 (1961); *Fuster v. Busó*, 102 D.P.R. 327, 342 (1974).

Negar fuera de la arena política la legitimación activa a los legisladores para vindicar sus derechos constitucionales es reducir esa función a meros espectadores y, ante los abusos mayoritarios, cerrarles las puertas de los tribunales. Así olvidamos que, a fin de cuentas, la legitimación activa de los legisladores *nace* de la Constitución. Nuestra ley fundamental visualiza a las minorías como el instrumento democrático de fiscalización idóneo para frenar los excesos de las mayorías.

Es obvio, que si cualesquiera —Primer Ejecutivo o la Asamblea Legislativa— menoscaba o incumple dicho deber constitucio-

nal, el otro poder puede legítimamente venir a los tribunales a compeler su cumplimiento. Y en sana lógica es ineludible concluir que si la Asamblea Legislativa, como Cuerpo, no actúa en defensa de sus prerrogativas constitucionales, cualquiera de sus miembros tiene legitimación activa para acudir a los tribunales y obligar al Primer Ejecutivo a cumplir con el deber afirmativo impuesto por nuestra Constitución. *Esa es la única forma que puede evitarse que se menoscabe su voto. No concebimos cómo en un gobierno de leyes, no hombres, un legislador venga obligado a aceptar dócil y pasivamente la inconstitucionalidad o ilegalidad de un acto ejecutivo que anula una legislación vigente —y sus votos— por el simple hecho de ostentar esa condición. En materia de justiciabilidad, no debemos confundir legitimidad con "cuestión política".* (Énfasis en el original suprimido y énfasis suplido.) *Hernández Torres v. Gobernador*, supra, págs. 853–854, opinión disidente.

### III

Ahora bien, en este caso el demandante apelado David Noriega Rodríguez no sufrió un daño claro y palpable a sus prerrogativas y funciones legislativas y, por ende, no tiene legitimación activa. Como expresáramos en nuestro disenso en *Hernández Torres v. Gobernador*, supra, pág. 851, opinión disidente, citando a L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, pág. 151, " 'procede reconocerle a un legislador legitimación activa [*standing*] *cuando demuestra que la actuación impugnada tiene el efecto de anular su voto, pasado o futuro*, o cuando están en juego otros aspectos fundamentales de sus prerrogativas legislativas' ". (Traducción nuestra y énfasis en el original.)

Contrario a la situación de aquel caso en que Noriega Rodríguez había votado *contra* la ley de presupuesto impugnada, en el caso ante nos votó a *favor* de la R.C. de la C. Núm. 891 y no participó en la R.C. del S. Núm. 356. Ese proceder legislativo le impide invocar daño a sus prerrogativas y utilizar el foro judicial para impugnar lo que no combatió.

**– O –**

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

La opinión que emitimos hoy reafirma los criterios que hemos elaborado para determinar si un legislador tiene legitimación activa para instar un pleito. *Hernández Torres v. Hernández Colón et al.*, 131 D.P.R. 593 (1992); *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992). El presente caso claramente demuestra que existen ocasiones en que un legislador posee legitimación para cuestionar una actuación u omisión de la Rama Ejecutiva, la cual estima inconstitucional. Específicamente, resolvemos que cuando las prerrogativas de un legislador se ven directamente afectadas por la decisión del Gobernador de Puerto Rico de no poner en vigor una ley, en este caso, viéndose impedido de adjudicar los fondos que por ley le correspondía distribuir, éste tendrá legitimación para impugnar la omisión de la Rama Ejecutiva de ponerla en vigor.

Por otro lado, también concluimos que las resoluciones impugnadas infringen nuestro principio constitucional de separación de poderes. Al así hacerlo, reiteramos la vigencia e importancia de nuestros pronunciamientos en *Banco Popular, Liquidador v. Corte*, 63 D.P.R. 66, 70–77 (1944), los cuales son endosados por la opinión que hoy emitimos. Aunque *Banco Popular, Liquidador v. Corte*, supra, fue resuelto hace cincuenta años, lo que allí sostuvimos sobre el análisis judicial que debemos seguir ante problemas de separación de poderes es de igual o más vigencia hoy que entonces. En dicho caso expresamos que "la separación absoluta [de poderes] nunca ha existido y nunca se pretendió que existiera. ... [N]o se puede afirmar con demasiado énfasis que las ramas gubernamentales están tan interrelacionadas en sus funciones como son independientes entre sí. ... Las exigencias gubernamentales han hecho necesario que se liberalice una mera adhesión doctrinaria a un prin-

cipio tan flexible y práctico, que es grandemente una cuestión de juiciosa aproximación, como la de la separación de poderes". *Banco Popular, Liquidador v. Corte*, supra, págs. 71–76. Sostuvimos, además, citando a Holmes, que:

> "Las grandes disposiciones de la Constitución no establecen y dividen los campos en blanco y negro. Se encuentra que aun las más específicas terminan en la penumbra fundiéndose gradualmente de un extremo a otro. ... No parece necesitarse argumentación para demostrar que no importa cómo las disfracemos por medio de palabras disimuladoras no podemos obtener la distinción entre funciones legislativas y ejecutivas con precisión matemática y dividir las ramas en compartimientos impenetrables ...". *Banco Popular, Liquidador v. Corte*, supra, pág. 73 esc. 2.[1]

Por lo anteriormente expuesto, ante problemas de separación de poderes, utilizamos un enfoque flexible que otorga sustancial deferencia a las Ramas Políticas en cuanto a su definición de lo que son funciones "ejecutivas" y "legislativas".[2] Como correctamente señala la opinión del Tribunal en el presente caso, para determinar si se ha violado el principio de separación de poderes debemos examinar cada situación, determinando en cada caso específico (1) si la función específica ha sido expresamente asignada por la Constitución a la rama gubernamental que trata de ejercitarla, o (2) si su ejecución por tal rama es un incidente necesario para el ejercicio de otras funciones que le fueron expresamente conferidas. *Banco Popular, Liquidador v. Corte*, supra, pág. 74.

Es menester señalar que la jurisprudencia sobre la separación de poderes en el ámbito federal no es obligatoria en Puerto Rico cuando resolvamos controversias sobre la separación de poderes en nuestro ordenamiento gubernamental. Aunque acudimos a dicha jurisprudencia

---

[1] Fue el punto de vista de Holmes el que eventualmente prevaleció. Nota, *The Vesting Clauses, the Nixon Test, and the Pharaoh's Dreams*, 78 (Núm. 5) Va. L. Rev. 1253, 1259–1260 (1992).

[2] Las ramas políticas tienen suficientes recursos para defenderse una frente a la otra. J.L. Entin, *Separation of Powers, the Political Branches, and the Limits of Judicial Review*, 51 Ohio St. L.J. 175, 209 (1990); Nota, *supra*.

para apoyar la decisión en el presente caso, ello no significa que estemos incorporando a nuestra doctrina de separación de poderes el rígido enfoque que la jurisprudencia citada toma ante problemas de separación de poderes ni tampoco las conclusiones que adopta. Véanse: P.L. Strauss, *Formal and Functional Approaches to Separation of Powers Questions — A Foolish Inconsistency?*, 72 (Núm. 3) Cornell L. Rev. 488, 489 (1987); T.O. Sargentich, *The Contemporary Debate about Legislative — Executive Separation of Powers*, 72 Cornell L. Rev. 430 (1987); B. Schwartz, *Curiouser and Curiouser: The Supreme Court's Separation of Powers Wonderland*, 65 (Núm. 4) Notre Dame L. Rev. 587, 600 y 606 (1990); J.L. Entin, *Separation of Powers, the Political Branches, and the Limits of Judicial Review*, 51 Ohio St. L.J. 175, 192–195, 197–200 y 210–213 (1990); Nota, *Separation of Powers: No Longer Simply Hanging in the Balance*, 79 (Núm. 1) Geo. L.J. 173, 173–182 (1990); Nota, *The Vesting Clauses, the Nixon Test, and the Pharaoh's Dreams*, 78 (Núm. 5) Va. L. Rev. 1253 (1992).

En el presente caso, los legisladores, en su capacidad oficial, interpretan, administran y ponen en vigor el mandato legislativo contenido en las resoluciones impugnadas. Como correctamente concluye la opinión del Tribunal, esta función no fue expresamente asignada por la Constitución a la Rama Legislativa ni a sus miembros o agentes, ni es un incidente necesario para el ejercicio de otras funciones que sí le fueron expresamente conferidas. En la ejecución de las resoluciones impugnadas la función de la Rama Ejecutiva quedaría reducida a una puramente ministerial, quedando toda la discreción en manos de los legisladores.(³) La decisión del Tribunal asegura que no se

---

(³) También resulta inconstitucional la legislación aquí impugnada bajo el criterio, también flexible, esbozado por el Juez White en su opinión disidente en *Bowsher v. Synar*, 478 U.S. 714 (1986). En dicha opinión se expresa que el poder ejecutivo consiste en interpretar y poner en vigor el mandato de una ley y que la separación de poderes impide al Congreso reservarse poderes ejecutivos para sí o para sus agentes.

altere el delicado balance entre los poderes gubernamentales y constituye una contribución importante al desarrollo de nuestro esquema republicano de gobierno y a la vida democrática.

---

Se añade que, por lo general, el proceso legislativo le concede a cada rama una oportunidad amplia de defender sus intereses y que, en última instancia, debe examinarse "whether the Act so alters the balance of authority among the branches of government as to pose a genuine threat to basic division between the lawmaking power and the power to execute the law". *Bowsher*, supra, pág. 776.